CLERK'S OFFICE
A TRUE COPY
Jun 20, 2025
s/ JDH
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
Information about the location of the cellular telephone assigned call numbers (414) 252-9913 and (414) 888-2248 as further described in Attachment A

Case No. 25-M-417 (SCD)

Matter No. 2025R00094

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the ______ District of ______ *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before 7-4-25 *(not to exceed 14 days)*

❒ in the daytime 6:00 a.m. to 10:00 p.m. ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to Hon. Stephen C. Dries.
*(United States Magistrate Judge)*

☑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❒ for ____ days *(not to exceed 30)* ☑ until, the facts justifying, the later specific date of 03/27/2026.

Date and time issued: 6-20-25. 12:30 pm

Stephen C. Dries
*Judge's signature*

City and state: Milwaukee, WI

Honorable Stephen C. Dries, U.S. Magistrate Judge
*Printed name and title*

**Return**

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: ____________________

____________________
*Executing officer's signature*

____________________
*Printed name and title*

**ATTACHMENT A**
**Property to Be Searched**
**Matter No. 2025R00094**

1. Records and information associated with the cellular telephone assigned call numbers **(414) 252-9913** and **(414) 888-2248** (the "**Target Cell Phones**"), with a listed subscriber as Dale Fisher, with Candance Fisher as an authorized person on the account, that is in the custody or control of U.S. Cellular (referred to herein and in Attachment B as the "Service Provider"), a wireless communications service provider that is headquartered at 8410 W. Bryn Mawr Avenue, Suite 800, Chicago, IL 60631.

2. The **Target Cell Phones**.

**<u>ATTACHMENT B</u>**
**Particular Things to be Seized**
**Matter No. 2025R00094**

## I. Information to be Disclosed by the Service Provider

To the extent that the information described in Attachment A is within the possession, custody, or control of the Service Provider, including any information that has been deleted but is still available to the Service Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Service Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

a. The following subscriber and historical information about the customers or subscribers associated with **(414) 252-9913** for the time period October 1, 2024, to the present and **(414) 888-2248** for the time period May 6, 2025, to the present:

i. Names (including subscriber names, user names, and screen names);

ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

iii. Local and long distance telephone connection records;

iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

v. Length of service (including start date) and types of service utilized;

vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records; and

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the **Target Cell Phones**, including:

1. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

2. information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received) as well as data connection location information and transactions (registration of network events), related to all specialized carrier records that may be referred to as LOCDBOR (Location Database), Historical Mobile Locate (HML), NELOS (Network Event Location System), RTT (Round Trip Time/Return Trip Time/Real Time Tool), PCMD (Per Call Measurement Data), TDOA (Time Difference of Arrival) or Timing Advance Information, Mediation Records, E9-1-1, and/or Historical GPS/Mobile Locate Information which shows GPS location (longitude and latitude) and Cell-Site and sector of the device in relationship to the network when connected to the network for the above referenced number.

b. Information associated with each communication to and from the **Target Cell Phones** for a period of 30 days from the date of this warrant, including:

i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

ii. Source and destination telephone numbers;

iii. Date, time, and duration of communication; and

iv. All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the **Target Cell Phones** will connect at the beginning and end of each communication as well as data connection location information and transactions (registration of network events), related to all specialized carrier records that may be referred to as LOCDBOR (Location Database), Historical Mobile Locate (HML), NELOS (Network Event Location System), RTT (Round Trip Time/Return Trip Time/Real Time Tool), PCMD (Per Call Measurement Data), TDOA (Time Difference of Arrival) or Timing Advance Information, Mediation Records, E9-1-1, and/or Historical

GPS/Mobile Locate Information which shows GPS location (longitude and latitude) and Cell-Site and sector of the device in relationship to the network when connected to the network for the above referenced number.

The Honorable William E. Duffin has also issued an order pursuant to 18 U.S.C. § 3123, dated June 2, 2025, for such information associated with **414-252-9913** and June 17, 2025, for such information associated with **414-888-2248**.

c. Information about the location of the **Target Cell Phones** for a period of 30 days, during all times of day and night. "Information about the location of the Subject Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Service Provider, the Service Provider is required to disclose the Location Information to the government. In addition, the Service Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of the **Target Cell Phones** on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

ii. This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II. Information to be Seized by the Government

All information described above in Section I that constitutes evidence, fruits, contraband, and instrumentalities of violations Title 21, United States Code, §§ 841(a), 843(b), and 846 involving Quentin Apkarian, Joey Miramontes, Joshua Ramos, Christopher Badgett, Kiara Ramos, Trayveon Roy, Isaac Sawyer, Jaime Rosado, Andrew Gbur, Elion LeFlore, Dale Fisher, and others known and unknown, during the period of October 1, 2024 to the present.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Service Provider in order to locate the things particularly described in this Warrant.

CLERK'S OFFICE
A TRUE COPY
Jun 20, 2025
s/ JDH
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

Information about the location of the cellular telephone assigned call numbers (414) 252-9913 and (414) 888-2248 as further described in Attachment A

Case No. 25-M-417 (SCD)

Matter No. 2025R00094

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the __________ District of ________________ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. §§ 841(a)(1), 843 (b), and 846 | Distribution of a Controlled Substance, Possession with the Intent to Distribute a Controlled Substance, Use of a Communication Facility in Furtherance of a Drug Trafficking Offense, and Conspiracy to Distribute a Controlled Substance. |

The application is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.

☑ Delayed notice of ____ days *(give exact ending date if more than 30 days:* March 27, 2026 *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

[signature]
*Applicant's signature*

Mark Haleen, FBI TFO
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone *(specify reliable electronic means)*.

Date: 6-20-25

[signature]
*Judge's signature*

City and state: Milwaukee, WI

Honorable Stephen C. Dries, U.S. Magistrate Judge
*Printed name and title*

**<u>AFFIDAVIT IN SUPPORT OF</u>**
**<u>AN APPLICATION FOR A SEARCH WARRANT</u>**
**Matter No. 2025R00094**

I, Mark Haleen, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call numbers **(414) 252-9913** and **(414) 888-2248** (the "**Target Cell Phones**"), with a listed subscriber as Dale Fisher, with Candance Fisher as an authorized person on the account. whose service provider is U.S. Cellular ("Service Provider") a wireless telephone service provider headquartered at 8410 W. Bryn Mawr Avenue, Suite 800, Chicago, IL 60631 The Target Cell Phones is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2. Because this warrant application seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), I also make this affidavit in support of an application by the United States of America for an order pursuant to 18 U.S.C §§ 3122 and 3123, authorizing the installation and use of pen registers and trap and trace devices ("pen-trap devices") to record, decode, and/or capture dialing, routing, addressing, and signaling information associated with each communication to or from the Target Cell Phone.

3. I am a sworn law enforcement officer with the Village of Mount Pleasant and a sworn Task Force Officer with the Federal Bureau of Investigation (FBI), with authority to investigate federal offenses including violations of Titles 18 and 21 of the United States Code.

4. I have been employed as a Law Enforcement Officer with the Village of Mount Pleasant (Wisconsin) since September 2010 and a sworn Federal Task Force Officer with the FBI since January 2020. I have obtained a Bachelor of Science Degree in Sociology from Central Michigan University. I have been involved in the enforcement and investigation of numerous violations of federal and state law to include drug trafficking investigations, firearm trafficking investigations, and violent crime related cases. I have personally conducted and participated in numerous investigations that have given me familiarity with the various methods that criminals use to conduct illicit firearm and narcotics transactions in violation of federal law.

5. As part of my duties, I investigate criminal violations relating to narcotics trafficking, including criminal violations of the Federal Controlled Substance laws, including, but not limited to Title 21, United States Code, Sections 841, 843, and 846. By virtue of my employment as a federal task force officer and prior law enforcement experience, I have knowledge of and/or performed various tasks, which include, but are not limited to:

a. I have functioned as both a case agent and co-case agent in numerous investigations into illegal drug distribution conspiracies.

b. I have interviewed witnesses, confidential human sources (CHS) and sources of information (SOI) relative to the illegal trafficking of drugs and the distribution of monies and assets derived from the illegal trafficking of drugs (laundering of monetary instruments).

c. I have utilized informants to investigate drug trafficking. Through informant interviews, and extensive debriefings of individuals involved in drug trafficking, I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin and throughout the United States.

d. I have also relied upon informants to obtain controlled substances from dealers.

e. I have extensive experience conducting street surveillance of individuals engaged in drug trafficking. I have participated in the execution of numerous search warrants where controlled substances, drug paraphernalia, and drug trafficking records were seized.

f. I am familiar with the appearance and street names of various drugs, including marijuana, heroin, fentanyl, cocaine, cocaine base, ecstasy, and methamphetamine. I am familiar with the methods used by drug dealers to package and prepare controlled substances for sale. I know the street values of different quantities of the various controlled substances.

g. I am familiar with the language utilized over the telephone to discuss drug trafficking, and know that the language is often limited, guarded, and coded.

h. I know that drug traffickers often use electronic equipment and cellular telephones to conduct drug trafficking operations.

i. I know that drug traffickers commonly have in their possession, and at their residences and other locations where they exercise dominion and control, firearms, ammunition, and records or receipts pertaining to such.

j. I know that drug traffickers often put their telephones in nominee names to distance themselves from telephones that are utilized to facilitate drug trafficking.

k. I know that drug traffickers often use drug proceeds to purchase assets such as vehicles, property, and jewelry. I also know that drug traffickers often use nominees to purchase and/or title these assets to avoid scrutiny from law enforcement officials.

6. I have participated in numerous investigations involving the seizure of computers, cellular phones, cameras, and other digital storage devices, and the subsequent analysis of electronic data stored within these devices. I have also participated in investigations involving the use of historical and prospective location information to identify targets, map patterns of travel, corroborate other evidence, and apprehend persons to be arrested. On numerous occasions, this electronic evidence has provided proof of the crimes being investigated and corroborated information already known or suspected by law enforcement. During my investigations, I have regularly used electronic evidence relating to the commission of criminal offenses, including intent, motive, manner, means, and the identity of co-conspirators.

7. In addition to my experience in the investigation of individuals involved in federal criminal offenses, I also have knowledge and experience in the apprehension and prosecution of

individuals involved in federal criminal offenses. I am familiar with and have experience in the use of devices used to commit those offenses as well as the available technology that can be used by law enforcement to assist in identifying the users of those devices and their locations.

8. As such, I am an investigative or law enforcement officer within the meaning of Section 2510(7) of Title 18, United States Code; that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

9. The facts in this affidavit come from: my personal observations, my training and experience, my review of documents, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is probable cause for the requested warrant and does not set forth all my knowledge about this matter.

10. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, §§ 841(a), 843(b), and 846 have been committed, are being committed, and/or will be committed by Quentin Apkarian, Joey Miramontes, Joshua Ramos, Christopher Badgett, Kiara Ramos, Trayveon Roy, Isaac Sawyer, Jaime Rosado, Andrew Gbur, Elion LeFlore, Dale Fisher, and others known and unknown. There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations and will lead to the identification of individuals who are engaged in the commission of these offenses.

11. The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

12. The United States, including Federal Bureau of Investigation is conducting a criminal investigation of Quentin Apkarian, Joey Miramontes, Joshua Ramos, Christopher Badgett, Kiara Ramos, Trayveon Roy, Isaac Sawyer, Jaime Rosado, Andrew Gbur, Elion Leflore, Dale Fisher, and others, known and unknown, regarding possible violations of Title 21 U.S.C. §§ 841(a)(1), 843(b), and 846 (Distribution of a Controlled Substance, Possession with the Intent to Distribute a Controlled Substance, Use of a Communication Facility in Furtherance of a Drug Trafficking Offense, and Conspiracy to Distribute a Controlled Substance). As detailed below, members of the Apkarian Drug Trafficking Organization ("Apkarian DTO") are actively selling cocaine and fentanyl in southeastern Wisconsin.

13. Special Agents of the Federal Bureau of Investigations and local officers have received information concerning the illegal drug trafficking activities of members of the Apkarian DTO from a confidential human source ("CHS#1"):

a. CHS #1 has been reporting to the FBI since approximately September of 2024. CHS #1 is cooperating in exchange for monetary consideration. To date, CHS #1 has received $30,253.72 in monetary compensation for CHS #1's cooperation with the FBI. Certain information provided by CHS #1 concerning this investigation has been corroborated from external sources, including consensually recorded audio and visual recordings, multiple controlled narcotics purchases, and a review of information contained within law enforcement databases. CHS #1 is a convicted felon and has a criminal history that includes prior misdemeanor convictions for traffic offenses, Bail Jumping, Disorderly Conduct, Possession of THC, Resisting an Officer, and Retail Theft. CHS #1 has prior felony convictions for Burglary and Bail Jumping. CHS #1 previously had a pending criminal traffic charge for operating a vehicle after revocation, which was dismissed as consideration for CHS#1's cooperation with another law enforcement officer. I have discussed CHS #1's cooperation with the other law enforcement officer, and CHS #1 has provided reliable cooperation to that agency. CHS #1 has no criminal convictions in the past five years. At no time during CHS #1's cooperation with the FBI have I found CHS #1 to have provided false information or engage in untruthful or deceptive behavior. As further detailed below, during controlled narcotics and/or

firearms/machinegun purchases, CHS #1 surreptitiously recorded the narcotics and/or firearms/machinegun transactions at my direction. Case agents later debriefed CHS #1 concerning what occurred during each transaction and then compared CHS #1's version of events with the recordings and case agent observations. Each time, CHS #1's information was corroborated by these independent sources. The basis of CHS #1's information detailed below is CHS #1's own personal observations and participation on the controlled narcotics and/or firearms/machinegun purchases. Within the context of the information detailed and relied upon for purposes of this application, I believe that CHS #1 is credible and that CHS #1's information is reliable.

14. Starting in October 2024, CHS#1 began conducting buys from Apkarian DTO members on behalf of law enforcement. To date, CHS#1 has conducted at least 30 buys from Apkarian DTO members for methamphetamine, marijuana, cocaine, fentanyl, and/or firearms.

15. Based on my training and experience, I know a "controlled buy" is a law enforcement operation in which an informant (such as CHS#1) purchases drugs from a target. The operation is conducted using surveillance, usually audio and video taping equipment, and pre-recorded purchase money. When an informant is used, s/he is searched for contraband, weapons, and money before the operation. The informant is also wired with a concealed body recorder and/or a monitoring device. When the transaction is completed, the informant meets cases agents at a pre-determined meet location and gives the purchased drugs and the recording/monitoring equipment to the case agents. The informant is again searched for contraband, weapons, and money and then interviewed by the case agents about the drug transaction. A sample of the suspected drugs is then field tested by the case agents for the presence of controlled substances and then placed in inventory pursuant to normal inventory procedures. If applicable, all of the calls to the target by the informant are consensually recorded calls under the direction and control of case agents and made in the presence of case agents. Additionally, case agents observe the informant dial the target's number on each occasion and the contact is verified through telephone

records. When communication between the informant is done via electronic means (such as use of Facebook Messenger), case agents review the electronic communications, verify the user/profile names involved, and maintain a copy of the communications as part of the case file. Unless otherwise noted, the controlled buys and telephone contacts summarized below were conducted pursuant to the above procedures. Further, unless otherwise noted, all drug results are based on presumptive field testing and field weights without packaging.

16. As detailed below, case agents have been conducting court-authorized wire interceptions of communications associated with five DTO lines since mid-May 2025. During the interception period coupled with controlled buys with CHS #1, case agents discovered the user of cellular phone numbers **(414) 252-9913** and **(414) 888-2248** (**Target Cell Phones**) is a likely crystal methamphetamine source of supply to the DTO.

17. Case agents believe the user of **(414) 252-9913** and **(414) 888-2248** (**Target Cell Phones)** to be Dale Fisher**.**

**A. TIII Authorization**

18. On May 13, 2025, the Honorable Lynn Adelman, United States District Judge, Eastern District of Wisconsin, entered an order authorizing the initial interception of wire communications to and from (414) 550-7820 (TARGET TELEPHONE 1), used by Quentin Apkarian, to and from (414) 550-8124 (TARGET TELEPHONE 2), used by Joey Miramontes, and (414) 801-2099 (TARGET TELEPHONE 3), and used by Christopher Badgett (herein the TARGET TELEPHONES). On June 13, 2025, Judge Adelman, entered an order authorizing the extension of the interception of wire communications to and from (414) 550-7820 (TARGET TELEPHONE 1), used by Quentin Apkarian, to and from (414) 550-8124 (TARGET TELEPHONE 2), used by Joey Miramontes, and (414) 801-2099 (TARGET TELEPHONE 3),

and used by Christopher Badgett (herein the TARGET TELEPHONES). The affidavits in support of wire interceptions over TARGET TELEPHONES 1, 2, and 3 is hereby incorporated into this Affidavit.

**B. May 29, 2025 Controlled Buy**

19. On May 29, 2025, at 10:57AM, at the direction of case agents, CHS #1 placed a connected voice call to TARGET TELEPHONE 2 (Miramontes) for the purpose of obtaining three ounces of crystal methamphetamine. This call was recorded through the court authorized interception of Miramontes' phone line (TARGET TELEPHONE 2). It was also captured via the consensual recording of CHS #1's telephone number. This call was reviewed by case agents. I confirmed that this call occurred with TARGET TELEPHONE 2 by reviewing the court authorized pen register/trap and trace data for TARGET TELEPHONE 2. Below is a transcription of the relevant portion of that call:

> **CHS #1:** "Three zips of that Tina"
> **MIRAMONTES**: "Yep. I got a call him right quick."
> **CHS #1:** "alright, call him back and then let me know. You think it will be the same price that 16, what was it that $1650?"
> **MIRAMONTES:** "Most likely and shit, with him and shit its more about like the more you grab the lesser he goes type shit. You know what I'm saying, it's kinda hard to grab a lot and shit when the price is [ui]. Let me call him first and shit"
> **CHS #1:** "alright call him and let me know"
> **MIRAMONTES:** "did you see that, them two drakes? Dude has them bitches on deck and shit."
> **CHS #1:** "I probably won't have no money til tomorrow or the next day bro, to be honest with you for that."
> **MIRAMONTES:** "If anything whats that called you want me to grab at least one of them and put if up for you?
> **CHS #1:** "Let me confirm that with you."
> **MIRAMONTES:** "It's up to you and shit cause I aint gonna lie that Mini Drake, that mini drake, thats probably going to be the highest commodity one just because you can maneuver with it, you can tuck it, you can do anything with that one and shit."
> **CHS #1:** "Alright give me a second then, Im gonna call you right back. but see whats up with those right now."

20. Based on my training and experience, I believe that in this call: CHS #1 is requesting three ounces of crystal methamphetamine from Miramontes ("Three zips of that Tina"). Miramontes is telling CHS #1 that he will have to get a hold of his source of supply ("Yep. I got a call him right quick.") and a price has not been determined yet ("Most likely and shit, with him and shit its more about like the more you grab the lesser he goes type shit…")

21. On May 29, 2025, at 11:00AM, at the direction of case agents, CHS #1 placed a connected voice call to TARGET TELEPHONE 2 (Miramontes) for the purpose of obtaining three ounces of crystal methamphetamine. This call was recorded through the court authorized interception of Miramontes' phone line (TARGET TELEPHONE 2). It was also captured via the consensual recording of CHS #1's telephone number. This call was reviewed by case agents. I confirmed that this call occurred with TARGET TELEPHONE 2 by reviewing the court authorized pen register/trap and trace data for TARGET TELEPHONE 2. Below is a transcription of the relevant portion of that call:

> **MIRAMONTES:** "I'm trying to call dude right now and he ain't answering though but, hopefully he probably just asleep."
> **CHS #1:** "Yeah, alright well let me know soon then, Ill be ready Ill probably just grab the money from dude, cause it will probably go through either way huh?"
> **MIRAMONTES:** "yeah just grab the money from dude cause most likely it will go through."
> **CHS #1:** "alright bet, then um, I'm gonna have just just hold of on those ones right now cause I've been like stockpiling boy."
> **MIRAMONTES:** "alright let me give you a call back let me call this nigga and shit, cause he just called and shit"

22. Based on my training and experience, I believe that in this call: the conversation from the previous call between Miramontes and CHS #1 continued. Miramontes is telling CHS #1 that Miramontes is contacting a source of supply, but is not getting an answer ("I'm trying to call dude right now and he ain't answering though but, hopefully he probably just asleep.").

23. I reviewed the pen register/trap and trace records for TARGET TELEPHONE 2 and found that Miramontes made two outgoing calls to 414-242-9011 at 10:59AM that went unanswered and sent two outgoing text messages to 414-242-9011 at 10:59AM. I believe that Miramontes is attempting to contact his crystal methamphetamine source of supply ("I'm trying to call dude right now…") at 414-242-9011.[1]

24. On May 29, 2025, at 11:38AM, at the direction of case agents, CHS #1 placed a connected voice call to TARGET TELEPHONE 2 (Miramontes). This call was recorded through the court authorized interception of Miramontes' phone line (TARGET TELEPHONE 2). It was also captured via the consensual recording of CHS #1's telephone number. This call was reviewed by case agents. I confirmed that this call occurred with TARGET TELEPHONE 2 by reviewing the court authorized pen register/trap and trace data for TARGET TELEPHONE 2. Below is a transcription of the relevant portion of that call:

> **MIRAMONTES:** "I think he's asleep right now cuz his phones just like going to voicemail"
> **CHS #1:** "Oh ok, well shit um, let me know then once you hear back."
> **MIRAMONTES:** "Alright say less."
> **CHS #1:** "I'll be waiting to hear from you."
> **MIRAMONTES:** "Alright love bro."
> **CHS #1:** "Bet (UI), and I got the cash too so let me, let me know."
> **MIRAMONTES:** "You say what?"
> **CHS #1:** "I said I got the cash too now so just let me know."
> **MIRAMONTES:** "Alright for sure, bet."
> **CHS #1:** "Alright bet."
> **MIRAMONTES:** "Alright love."

25. Based on my training and experience, I believe that in this call: Miramontes is telling CHS #1 that the methamphetamine source of supply is not answering the phone and that

1 Unbeknownst to Miramontes, his crystal methamphetamine source of supply, who was identified as Elion Leflore changed his phone number to 414-340-9162 on approximately May 28, 2025. In prior affidavits, LeFlore was referred to as UM9011 and UM9162 because he had not yet been identified. As detailed above, LeFlore has now been identified as the user of 414-242-9011 and 414-340-9162.

the call is being directed to voicemail ("I think he's asleep right now cuz his phones just like going to voicemail"). CHS #1 then tells Miramontes that CHS #1 has the money for the crystal methamphetamine ("I said I got the cash too now so just let me know.")

26. On May 29, 2025, at 1:48PM, court authorized interceptions over TARGET TELEPHONE 2 captured a connected voice call from Miramontes (TARGET TELEPHONE 2) to telephone number 414-340-9162, later identified as Elion Leflore through physical surveillance and court authorized electronic surveillance. This call was recorded through the court authorized interception of Miramontes' phone line (TARGET TELEPHONE 2). This call was reviewed by case agents. I confirmed that this call occurred with TARGET TELEPHONE 2 by reviewing the court authorized pen register/trap and trace data for TARGET TELEPHONE 2. Below is a transcription of the relevant portion of that call:

> **LEFLORE:** "You aint seen the text I [UI]"
> **MIRAMONTES:** "I just seen that I just seen that. I know, I got like fuckin three JB's in my phone."
> **LEFLORE**: "Oh so you probably dont know who the fuck that was."
> **MIRAMONTES:** "Oh hey yeah Twin probably about to call you right now"
> **LEFLORE**: "He did, he just called me. Thats why bro I'm just like what the fuck...man I'm just gonna call the dude directly."
> **MIRAMONTES:** "Yeah, cause I didn't know that cause this nigga I know named JB, this nigga be, bro, this nigga, dealing with this nigga and shit bro this nigga like dodges death every fucking five minutes and shit. Yeah dog, but what's that called, the other day nigga I was trying to call you nigga yo mother fucking phone wasn't on and shit. You missed out, we coulda had that mother fucker for you bro. My nigga had I had even better for your ass Nigga, my Nigga had a fuckin .300 blackout that was fully nigga. Nigga I was blowing your shit up, I called you like 8 times 9 times and I even waited 4 hours and then I called you 8 more times nigga. Then your phone just off, Im like bro I am looking on the Milwaukee recently booked page and .....locked up bro."
> **LEFLORE**: "Damn bro"
> **MIRAMONTES:** "Nigga, my nigga had a fully .300 blackout custom, the barrel was .300 blackout, and then the shell of it was like a whole nother gun. But you look at the barrel nigga barrel was .300 barrel nigga and that mother fucker was fully automatic nigga. I gotta a video blowin that bitch, I was blowin that mother fucker in the side of the house."
> **LEFLORE:** "Get me one of those"

**MIRAMONTES:** "I gotta hit hi m back up, see if he still has got it on deck. You coulda got that bitch for the low, guess how much you woulda got that for."
**LEFLORE:** "Forward it to me bro, how much you thinkin"
**MIRAMONTES:** "How much you think you woulda got that for? And you can switch it from semi to fully nigga. I mean you coulda got that bitch for like $650 nigga."
**LEFLORE:** "How much?"
**MIRAMONTES:** "Like $650 nigga"
**LEFLORE:** "I woulda came for it bro"
**MIRAMONTES:** "And the only, the only thing nigga is it did not come with bullets, but you don't give no fuck about that, you know what I am saying. Nigga I was fittin to grab that mother fucker nigga, I was calling your phone to verify that you wanted that nigga."
**LEFLORE:** "On my momma I did bro."
**MIRAMONTES:** "I just cant have that shit sitting around. I gotta nigga right now thats sellin two drakes"
**LEFLORE:** "Is it little?"
**MIRAMONTES:** "He got one micro Draco, but he want, I aint gonna lie, he kinda taxin on the micro Draco...he want 15 for the micro Draco"
**LEFLORE:** "Hell no"
**MIRAMONTES:** "But the other one and shit, he want 13"
**LEFLORE:** "Thats cause its big, I dont want the big one, I want the little ones"
**MIRAMONTES:** "You got 4 of them on you?"
**LEFLORE:** "I could go get it"
**MIRAMONTES:** "You might as well go grab it right now and shit, I'm gonna come past you."
**LEFLORE:** "Alright I fixin to call"
**MIRAMONTES:** "Do you think you could do them for the $250"
**LEFLORE:** "Uh..."
**MIRAMONTES:** "I'll grab 4 of them right now and shit if you can do it for $250, if not I can only grab 3."
**LEFLORE:** "Ok, let me make this call let me make sure their ready to come get em"
**MIRAMONTES:** "How long you thinkin"
**LEFLORE:** "I don't know, let me call him real quick. I am sitting in the lounge right now trying to grab his food."
**MIRAMONTES:** "Alright, just call me back please"
**LEFLORE:** "Ok as soon as I hear anything I will call you right back."
**MIRAMONTES:** "Ok, love bro."

27. Based on my training and experience, I believe that in this call: Miramontes finally reached the crystal methamphetamine source of supply, who goes by "JB" ("I just seen that I just seen that. I know, I got like fuckin three JB's in my phone."). Leflore asks if Miramontes saw the

text message ("You aint seen the text I [UI]"). I believe, in context, Leflore provided Miramontes with Leflore's new phone number after abandoning 414-242-9011. Miramontes tells Leflore that Miramontes has been trying to reach him and that Leflore's phone was going right to voicemail ("Nigga I was blowing your shit up, I called you like 8 times 9 times and I even waited 4 hours and then I called you 8 more times nigga. Then your phone just off, Im like bro I am looking on the Milwaukee recently booked page and [UI] locked up bro."). In context, in conjunction with the previous conversations with CHS #1, I believe that Leflore is the same person Miramontes was speaking to CHS #1 about ("…Milwaukee recently booked page and [UI] locked up bro.") and that the user of 414-242-9011 has switched phone numbers and is now using 414-340-9162. Miramontes asks Leflore if Leflore has four ounces of crystal methamphetamine ("You got 4 of them on you?") and Leflore replies that he could go get it ("I could go get it"). Miramontes confirms that he will purchase the four ounces ("You might as well go grab it right now and shit, I'm gonna come past you.") and Leflore agrees to make a call ("Ok, let me make this call let me make sure their ready to come get em").

28. I reviewed the historical call records, obtained via federal search warrant, for 414-340-9162 and found that immediately following the conclusion of the call with Miramontes, Leflore places an outgoing call at 1:54PM to **414-252-9913 (Target Cell Phone**) which goes unanswered. At 1:55PM Leflore places an outgoing connected voice call to **414-888-2248 (Target Cell Phone)** which lasts for 42 seconds. At 1:57 PM Leflore places another connected voice call to cell phone **414-888-2248 (Target Cell Phone)** which lasts for 59 seconds. Case agents reviewed subscribed for **Target Cell Phones**, which list a subscribe of Dale Fisher with a service provider of US Cellular. Case agents also observed Candance Fisher as an authorized user on the **Target Cell Phones.** Case agents observed telephone number **414-252-9913 (Target Cell Phone**)

has been active with US Cellular since November 2023 and **414-888-2248 (Target Cell Phone)** has been active with US Cellular since May 6, 2025.

29. On May 29, 2025, at 1:55PM, CHS #1 received a connected voice call from TARGET TELEPHONE 2 (Miramontes). This call was recorded through the court authorized interception of Miramontes' phone line (TARGET TELEPHONE 2). It was also captured via the consensual recording of CHS #1's telephone number. This call was reviewed by case agents. I confirmed that this call occurred with TARGET TELEPHONE 2 by reviewing the court authorized pen register/trap and trace data for TARGET TELEPHONE 2. Below is a transcription of the relevant portion of that call:

**CHS #1:** "Damn (UI)"
**MIRAMONTES:** "I, I got, I got one more, I got one more dude I can go through and shit but I just don't know what the fuck this nigga's taxing and shit, that's the only thing."
**CHS #1:** "Right. Yeah I was gonna say if dude answered if it was , if four was more worth while then, get a little price drop then I'd do four, but I guess see what's up if you can."
**MIRAMONTES:** "I'm, I'm still trying to give him a try and shit, this nigga just not answering like at all, like, this nigga like, I call and this shit going to voicemail, like so I'm hoping, I've been looking on the Milwaukee page I'm just trying to see if the nigga locked up or not."
**MIRAMONTES:** "Hell yeah bro. Well shit let me, let me call this nigga bro and let me try to make something happen bro, to see (UI)"
**CHS #1:** "Yeah let, let me make, let, let me know and then like, like I said like, if you gotta do an extra one just to make it worth the, I know you gotta make some pape too so let me know."
**MIRAMONTES:** "Yeah"
**CHS #1:** "So I'll, uh, I'll, I'll, you know what I'm saying, I'll do the four but if you can get the three, let me know the ticket bro."
**MIRAMONTES:** "Alright say less."
**CHS #1:** "I got the, I got the, I got dude's bread but I'll, I'll damn near just buy another one for myself to hold onto it."
**MIRAMONTES:** "Yeah no bullshit cause you can, I ain't gonna lie you can (UI)"
**CHS #1:** "I might try to just get something going by myself if I get an extra one so"
**MIRAMONTES:** "But you, nigga, that nigga, whoever dude is that's grabbing them and shit"
**CHS #1:** "Yeah"

**MIRAMONTES:** "I don't think he, I don't, I don't, I don't think he's uh, I don't think he's uh, what's that called, smoking it bro."
**CHS #1:** (UI)
**MIRAMONTES:** "I think, I think he's uh, I think he's dumping it."
**CHS #1:** "Yeah (UI), but like, he be so tweaked out bro when he gives me the money so it's like (UI)"
**MIRAMONTES:** "Ok alright dude's calling, dude's calling me right now let me call you right back."
**CHS #1:** "Alright bet."
**MIRAMONTES:** "Alright."

30. Based on my training and experience, I believe that in this call: Miramontes is telling CHS #1 that Miramontes is still having problems contacting the source of supply ("so, dude aint fucking answering this shit bro I don't know what the fuck he got going on and shit"). However, based on the previous call with 414-340-9162 (Leflore), I believe Miramontes is being untruthful with CHS #1 in order to allow Miramontes more time to complete the deal. At the end of the conversation, Miramontes tells CHS #1 that the source of supply is calling him right now ("Ok alright dude's calling, dude's calling me right now let me call you right back."). I reviewed the pen register/trap and trace records which show an incoming call from 414-340-9162 (Leflore) at 1:59PM. Additionally, I reviewed the historical call records for 414-340-9162 (Leflore) and found that 1:57PM Leflore sends two text messages to telephone number **414-888-2248 (Target Cell Phone)** followed by another connected voice call to **414-888-2248 (Target Cell Phone)** which lasts for 59 seconds.

31. On May 29, 2025, at 1:59PM, court authorized interceptions over TARGET TELEPHONE 2 captured a connected voice call to Miramontes (TARGET TELEPHONE 2) from 414-340-9162. This call was recorded through the court authorized interception of Miramontes' phone line (TARGET TELEPHONE 2). This call was reviewed by case agents. I confirmed that this call occurred with TARGET TELEPHONE 2 by reviewing the court authorized pen register/trap and trace data for TARGET TELEPHONE 2. The beginning of the call was not

captured due to unknown technical problems. Below is a transcription of the relevant portion of that call:

> **MIRAMONTES:** "Yeah yeah yeah, go ahead, go ahead, go ahead, go ahead"
> **LEFLORE:** "Alright I'm gonna call you later."
> **MIRAMONTES:** "Alright for sure say less"

32. I believe based on my training and experience that this call was a follow up conversation about the crystal methamphetamine purchase and that LEFLORE would be in touch with Miramontes in the future to further discuss the drug transaction.

33. On May 29, 2025, at 2:16PM, at the direction of case agents, CHS #1 placed a connected voice call to TARGET TELEPHONE 2 (Miramontes). This call was recorded through the court authorized interception of Miramontes' phone line (TARGET TELEPHONE 2). It was also captured via the consensual recording of CHS #1's telephone number. This call was reviewed by case agents. I confirmed that this call occurred with TARGET TELEPHONE 2 by reviewing the court authorized pen register/trap and trace data for TARGET TELEPHONE 2. Below is a transcription of the relevant portion of that call:

> **MIRAMONTES:** "Yo. It's, it's a go and shit bro I'm just waiting and shit cause he don't wanna talk numbers on the phone with me and shit so I gotta wait for the nigga (UI)"
> **CHS #1:** "Alright bet. Alright well just let me know then what it's gonna be three or four, and then"
> **MIRAMONTES:** "Alright say less. It's, it's, it's, it's gonna be four of them."
> **CHS #1:** "Four?"
> **MIRAMONTES:** "Yeah he said he gonna bring four of them."
> **CHS #1:** "Alright, well try to get a better price if you can for me then, and then uh"
> **MIRAMONTES:** "That's what, that's what I'm trying to do right now (UI), I'm fucking say shit to him cause he was like I don't want to talk numbers over the phone and shit, he was like I'll talk to you when I get there so"
> **CHS #1:** "Alright"
> **MIRAMONTES:** "He said he pulling up in a little bit and shit, we, we gotta try to make it happen today though because I gotta ship out to Chicago and be out there for a couple days."

**CHS #1:** "Alright well yeah, shit uh, let's try to make it quick then, uh, let me know as soon as you got it in hand and then give me the number and then I'll grab, cause I'm gonna have to stop at the ATM and get the rest of the money so let me know."
**MIRAMONTES:** "Alright say less."
**CHS #1:** "Alright (UI)"
**MIRAMONTES:** "Alright love bro."
**CHS #1:** "Love bro."

34. Based on my training and experience, I believe that in this call: Miramontes is telling CHS #1 that the deal is going to happen ("Yo. It's, it's a go and shit bro I'm just waiting and shit cause he don't wanna talk numbers on the phone with me and shit so I gotta wait for the nigga (UI)") and the source of supply is going to bring four ounces ("Yeah he said he gonna bring four of them.").

35. At 2:21PM, court authorized interceptions over TARGET TELEPHONE 2 captured a connected voice call to Miramontes (TARGET TELEPHONE 2) from the 414-340-9162 (Leflore). This call was recorded through the court authorized interception of Miramontes' phone line (TARGET TELEPHONE 2). This call was reviewed by case agents. I confirmed that this call occurred with TARGET TELEPHONE 2 by reviewing the court authorized pen register/trap and trace data for TARGET TELEPHONE 2. Below is a transcription of the relevant portion of that call:

**MIRAMONTES:** "Yo yeah I'm right here by Drew-by Drew Street.
**LEFLORE:** "I'm on the north side"
**MIRAMONTES:** "Where at, I can meet you halfway"
**LEFLORE:** "Ummm I'm finna be coming down to....alright hello...."
**MIRAMONTES:** "Yeah, hello."
**LEFLORE:** "Hey....*talks to people in the background*....mhmmm....that's cool, that's cool.......okay yeah that's fine, alright, alright, bye......*talking to MIRAMONTES* Ummm you trying to-can you meet me on like-like Capitol."
**MIRAMONTES:** "What umm it depends where at Capitol."
**LEFLORE:** "Like 11th. Right off the highway."
**MIRAMONTES:** "11th and Capitol?"
**LEFLORE:** "Yeah."
**MIRAMONTES:** "Yeah I got you."
UNKNOWN MALE IN CAR: "Tell him I'm bringing them things for him too."

**MIRAMONTES:** "Hey he said he's finna bring them things for you too."
**LEFLORE:** "On my life good lookin, I'm ready, I'm deep."
**MIRAMONTES:** "Alright for sure I got you, uh, whatchu call it I'm gonna start heading towards there right now."
**LEFLORE:** "Okay that's cool bro."
**MIRAMONTES:** "Hey, uh did you-Hey..."
**LEFLORE:** "Huh"
**MIRAMONTES:** "Did you uh-did you talk them numbers with him."
**LEFLORE:** "Oh I'm finna go bump into him like right as we speak. You just told me to hurry up fool I just got done eating bro."
**MIRAMONTES:** "I gotchu for sure."
**LEFLORE:** "Yeah yeah yeah."
**MIRAMONTES:** "Just-just make sure he knows that if he does them for the 250 I grab 4 of them but if he can't do them for 250 I only can grab 3."
**LEFLORE:** "I'mma tell him."
**MIRAMONTES:** "Alright fa sho say less."
**LEFLORE:** "Alright alright later."

36. Based on my training and experience, I believe that in this call: Miramontes and LEFLORE are setting up a meeting location ("11th and Capitol?") on the northside of Milwaukee to conduct the drug transaction. Miramontes questions if Leflore has gotten a price for the crystal methamphetamine from Leflore's source of supply ("Did you uh-did you talk them numbers with him.") and Leflore says he will shortly ("Oh I'm finna go bump into him like right as we speak. You just told me to hurry up fool I just got done eating bro."). Miramontes request that Leflore relays to the source of supply that Miramontes will purchase 4 ounces of crystal methamphetamine if the price is right ("Just-just make sure he knows that if he does them for the 250 I grab 4 of them but if he can't do them for 250 I only can grab 3.") otherwise will only be able to afford 3 ounces.

37. I reviewed the historical call records for 414-340-9162 (Leflore) and found that immediately after the above conversation with Miramontes, Leflore places an outgoing call at 2:23PM to **414-888-2248 (Target Cell Phone),** which appears to be unanswered. At 2:35PM Leflore receives an incoming call from **414-888-2248 (Target Cell Phone)** that lasts 51 seconds. Based on the my training, experience, and overall knowledge of this investigation, coupled with

the context of the above calls I believe that Leflore is contacting Fisher to obtain crystal methamphetamine which Leflore will then sell to Miramontes who will in turn sell to CHS #1.

38. At 2:40PM, at the direction of case agents, CHS #1 placed a connected voice call to TARGET TELEPHONE 2 (Miramontes). This call was recorded through the court authorized interception of Miramontes' phone line (TARGET TELEPHONE 2). It was also captured via the consensual recording of CHS #1's telephone number. This call was reviewed by case agents. I confirmed that this call occurred with TARGET TELEPHONE 2 by reviewing the court authorized pen register/trap and trace data for TARGET TELEPHONE 2. Below is a transcription of the relevant portion of that call:

**CHS #1:** "What up?"
**MIRAMONTES:** "Yo, yeah I'm waiting, still waiting on dude and shit."
**CHS #1:** "Oh ok, I just seen I had a missed call from you I thought you figured it out."
**MIRAMONTES:** "Nah I'm just waiting on him and shit, I'm trying to figure it out I just need a number from this nigga."
**CHS #1:** "Yeah, and then what, how long will it take you, you wanna do Pilot again?"
**MIRAMONTES:** "Yeah we can do Pilot again."
**CHS #1:** "(UI) or IKEA was better."
**MIRAMONTES:** "IKEA was a little a little bit low (UI)"
**CHS #1:** "It was low yeah, just, it was a little bit farther, but whatever you wanna do."
**MIRAMONTES:** "Yeah just a little bit further. Shit if you want we can do the IKEA."
**CHS #1:** "If that's gonna make it happen faster then yeah (UI)"
**MIRAMONTES:** "That's gonna make it happen way faster and shit cause I don't mind shooting up to IKEA right away and shit, it's just that I gotta go to IKEA and then I gotta shoot back down here and then I gotta shoot exactly right back on the freeway to Chicago."
**CHS #1:** "Yeah so you rather be closer to you then anything anyway."
**MIRAMONTES:** "Yeah it's just (UI), I gotta get my sister's clothes together and shit"
**CHS #1:** "Yeah."
**MIRAMONTES:** "All types of shit, cause she, she can't, so motherfucker gotta shower her and shit you know what I'm saying, so motherfucker gotta"
**CHS #1:** "Yeah."
**MIRAMONTES:** "Get her shit together for her and shit."

**CHS #1:** "Alright well um, as soon as you get it then let me know when you're on the way and, and then, give me like 10 minutes to leave cause it's gonna take me like 25 to get there."
**MIRAMONTES:** "That's fine."
**CHS #1:** "Alright, let me know then."
**MIRAMONTES:** "Alright love bro."

39. Based on my training and experience, I believe that in this call: Miramontes is telling CHS #1 that Miramontes still waiting for the supplier to obtain the crystal methamphetamine ("Yo, yeah I'm waiting, still waiting on dude and shit."). CHS #1 and Miramontes agree to meet at the Ikea store to complete the drug transaction ("Yeah just a little bit further. Shit if you want we can do the IKEA.").

40. I reviewed the historical call records for 414-340-9162 (Leflore) and found Leflore had three calls to **414-888-2248 (Target Cell Phone)** at 2:42PM (outgoing), 2:42PM (outgoing), and 2:49PM (incoming) lasting 0 seconds, 3 seconds, and 10 seconds respectively.

41. At 2:49PM, court authorized interceptions over TARGET TELEPHONE 2 captured a connected voice call to Miramontes (TARGET TELEPHONE 2) from 414-340-9162 (Leflore). This call was recorded through the court authorized interception of Miramontes' phone line (TARGET TELEPHONE 2). This call was reviewed by case agents. I confirmed that this call occurred with TARGET TELEPHONE 2 by reviewing the court authorized pen register/trap and trace data for TARGET TELEPHONE 2. Below is a transcription of the relevant portion of that call:

**LEFLORE:** "How far is you gang."
**MIRAMONTES:** "Yo yo."
**LEFLORE:** "how far is you gang?"
**MIRAMONTES:** "My bad, my bad, my bad, hello."
**LEFLORE:** "You hear me?"
**MIRAMONTES:** "You hear."
**LEFLORE:** "Yeah yea yeah how long how long you gonna be till you make it here?"
**MIRAMONTES:** "Shit, not even and shit hold on."

**LEFLORE:** "Like seven."
**MIRAMONTES:** "The highway the highway is clogged up and shit. I aint gonna lie it said 18 minutes and shit cuz it's clogged up unless i jump off the freeway *unintelligible* yep I'm gonna hop off the freeway *unintelligible* I'm just on the freeway until I see where it gets red...."
**LEFLORE:** "Bizzle you can't come closer Bizzle?.....Uh you trying to meet me on 10th and Locust?"
**MIRAMONTES:** "Yeah I can do that."
**LEFLORE:** "Yeah it's a little closer then you know cuz the highway is on the Locust highway then you can get right off."
**MIRAMONTES:** "Alright bet. Yeah yeah that seems better..."
**LEFLORE:** "Damn big fat boy too nigga."
**MIRAMONTES:** "You knew that....this not 580-this not 580 yet, this not 580"
**LEFLORE:** "Is it the 580? 580 on the way."
**MIRAMONTES:** "580 on the way."
**LEFLORE:** "Ay Bizzle...huh?....Let me call you right back, Let me call you right back [UI]"
**MIRAMONTES:** "We'll see you right there."
**LEFLORE:** "Alright *unintelligible*"
**MIRAMONTES:** "Southbound, southbound"
**LEFLORE:** "Be careful driving that block in that nice ass Benz"
**MIRAMONTES:** "I know I already know it....I got insurance on this motha fucka tho."

42. Based on my training and experience, I believe that in this call: Miramontes and Leflore have changed their meeting location to the area of 10th St and Locust (…Uh you trying to meet me on 10th and Locust?") and ("yeah I can do that"). Physical surveillance was sent to the area however were unable to observe Miramontes or Leflore and likely did not arrive in time to observe the meeting. I also believe based on the context of this call and the previous calls that Leflore has obtained the crystal methamphetamine and is on the way to meet Miramontes.

43. I reviewed the court authorized historical location records for 414-340-9162 (Leflore) and found that just prior to the above call with Miramontes, Leflore's cellular device travels from the area of Good Hope Road and North 107th St at 2:21PM to the vicinity of 5167 North 31st Street, Milwaukee, Wisconsin, which was identified as the residence of Fisher, at 2:46PM. The device then leaves that area and travels to the area of W Locust Street and I-43,

arriving in that area at approximately 2:59PM. Based on my training and experience, this would be consistent with Leflore meeting with Fisher to obtain the crystal methamphetamine, to then sell the crystal methamphetamine to Miramontes, who was then planning to sell the crystal methamphetamine to CHS #1.

44. At 3:01PM, court authorized interceptions over TARGET TELEPHONE 2 captured a connected voice call from Miramontes (TARGET TELEPHONE 2) to the Leflore (414-340-6192). This call was recorded through the court authorized interception of Miramontes' phone line (TARGET TELEPHONE 2). This call was reviewed by case agents. I confirmed that this call occurred with TARGET TELEPHONE 2 by reviewing the court authorized pen register/trap and trace data for TARGET TELEPHONE 2. Below is a transcription of the relevant portion of that call:

> **LEFLORE:** "Make a right and come all the way down, like park next to-by the blue car."
> **MIRAMONTES:** "Alright say less."
> **Unknown Male in Car**: "We're on 11th right now, we're on 11th right now, we're making a right on 10th."
> **MIRAMONTES:** "We hittin the corner right now and shit."
> **LEFLORE:** "I see you."
> **MIRAMONTES:** "You don't see me nigga."
> **LEFLORE:** "Nigga I see you what you talkin about nigga."
> **MIRAMONTES:** "Love."
> **LEFLORE:** "Love."

45. Based on my training and experience, I believe that in this call: Leflore is directing Miramontes to 11th Street near Locust Avenue ("We're on 11th right now, we're on 11th right now, we're making a right on 10th."). Leflore sees that Miramontes has arrived in the area ("I see you.").

46. At 3:12PM, at the direction of case agents, CHS #1 placed a connected voice call to TARGET TELEPHONE 2 (Miramontes). This call was recorded through the court authorized interception of Miramontes' phone line (TARGET TELEPHONE 2). It was also captured via the

consensual recording of CHS #1's telephone number. This call was reviewed by case agents. I confirmed that this call occurred with TARGET TELEPHONE 2 by reviewing the court authorized pen register/trap and trace data for TARGET TELEPHONE 2. Below is a transcription of the relevant portion of that call:

> **MIRAMONTES:** "You gotta, I, I just can't do it in here bro. Matter fact. Yeah but you gotta blow it out the window and shit bro. What's that called, uh, what's that called I was gonna say was he, he, he, he only, he only gave me, he only gave me three of them and shit."
> **CHS #1:** "Oh did he?"
> **MIRAMONTES:** "Yeah he only, he only gave me three and shit bro, it, and, they, they is good and shit bro it's just that, they, they is good and shit it's just that the price is still the same and shit."
> **CHS #1:** "So 1650 for the three."
> **MIRAMONTES:** "Yeah."
> **CHS #1:** "Alright that's fine."
> **MIRAMONTES:** "I was trying to get it to four and shit but he, he, he said dude being on some fucking cheap ass shit so."
> **CHS #1:** "Um, so I gotta get these kids from school real quick, um"
> **MIRAMONTES:** "And then, just let me know when you get them from school and then you just meet me, I'll, I'll shoot to IKEA just let me know then and shit and I'll jump on the freeway."
> **CHS #1:** "Alright, so let's say like, uh, let's meet at IKEA at uh 4:15, 4:15 will be good for me."
> **MIRAMONTES:** "That's perfect."
> **CHS #1:** "Alright I'll hit you up soon."
> **MIRAMONTES:** "Alright love bro."

47. Based on my training and experience, I believe that in this call: Miramontes is telling CHS #1 that Miramontes only obtained three ounces ("Yeah he only, he only gave me three and shit bro, it, and, they, they is good and shit bro it's just that, they, they is good and shit it's just that the price is still the same and shit.") and the price is $1650 ("So 1650 for the three" and "yeah"). CHS #1 tells Miramontes that they can meet around 4:15PM at the Ikea parking lot ("Alright, so let's say like, uh, let's meet at IKEA at uh 4:15, 4:15 will be good for me.").

48. At 3:29PM, at the direction of case agents, CHS #1 placed a connected voice call to TARGET TELEPHONE 2 (Miramontes). This call was recorded through the court authorized

interception of Miramontes' phone line (TARGET TELEPHONE 2). It was also captured via the consensual recording of CHS #1's telephone number. This call was reviewed by case agents. I confirmed that this call occurred with TARGET TELEPHONE 2 by reviewing the court authorized pen register/trap and trace data for TARGET TELEPHONE 2. Below is a transcription of the relevant portion of that call:

**MIRAMONTES:** "Yo."
**CHS #1:** "Bro like (UI) I'll be there at like 4:30 at the latest so"
**MIRAMONTES:** "That, that's fine, I ain't gonna lie, uh, bro about to, bro about to letting a chop go right now for the low nigga."
**CHS #1:** "For real?"
**MIRAMONTES:** "Yes nigga for the lowski nigga."
**CHS #1:** "Damn for real? (UI) What's, what's low?"
**MIRAMONTES:** "(UI) I know he trying dump, I know he trying to dump for under a g."
**CHS #1:** "For real? How, how much?"
**MIRAMONTES:** "Yeah, like 8."
**CHS #1:** "Damn for real (UI)"
**MIRAMONTES:** "Yeah"
**CHS #1:** "You got it too?"
**MIRAMONTES:** "Um, he's, he running up in there to go grab it right now and shit."
**CHS #1:** "Oh for real?"
**MIRAMONTES:** "Yeah."
**CHS #1:** "Shit well, uh I'm not, I'm not 100 percent on that but I'll let you know in a little bit."
**MIRAMONTES:** "(UI), you just let me know I, I'll, I'll, if anything bro I'll, I'll grab it and I'll just hold onto that bitch and shit."
**CHS #1:** "Yeah so then which one is it one of the ones you sent me?"
**MIRAMONTES:** "Uh, I'm not sure which one it is and shit, he, he just told me he's like I got something for you and shit he's like (UI) it's a chop and shit (UI) I'll throw it to you for the low I was like how much is the low and he was like shit I'll give it to you for 8, I was like go grab it so he went inside and shit."
**CHS #1:** "Alright well shit send me a picture of it real quick then, and uh, I'll confirm, I'm, I'm not 100 percent on that, but I'll let you know."
**MIRAMONTES:** "Alright well, you know, I'm gonna grab it so that way just in case if you ever do want to have somebody that wanna grab one or anything it will be right there and shit."
**CHS #1:** "Ok bet."
**MIRAMONTES:** "And then it'll be for the same price, it'll be, it'll, I'll just keep it for the same price and shit."
**CHS #1:** "For 800?"

**MIRAMONTES:** (UI)
**CHS #1:** "What is it, what is he able to, find out what it is and then call me back."
**MIRAMONTES:** "Alright say less, he said it's a big boy so."
**CHS #1:** "Alright bet, let me know."
**MIRAMONTES:** "Alright say less, love bro."
**CHS #1:** "Alright love bro."

49. Based on my training and experience, I believe that in this call: Miramontes is telling CHS #1 that Miramontes has access to a firearm ( "That, that's fine, I ain't gonna lie, uh, bro about to, bro about to letting a chop go right now for the low nigga.") for a low price ("(UI) I know he trying dump, I know he trying to dump for under a g.").

50. At 4:13PM, at the direction of case agents, CHS #1 placed a connected voice call to TARGET TELEPHONE 2 (Miramontes). This call was recorded through the court authorized interception of Miramontes' phone line (TARGET TELEPHONE 2). It was also captured via the consensual recording of CHS #1's telephone number. This call was reviewed by case agents. I confirmed that this call occurred with TARGET TELEPHONE 2 by reviewing the court authorized pen register/trap and trace data for TARGET TELEPHONE 2. Below is a transcription of the relevant portion of that call:

**MIRAMONTES:** "Yo I'm jumping on... the freeway now."
**CHS #1:** "Alright, well just give me a little bit long, like, I'm, I'm probably gonna be like 5 minutes later than you maybe 10 so."
**MIRAMONTES:** "That's fine."
**CHS #1:** "Alright, (UI) just pull in the middle then again or whatever so I can find you."
**MIRAMONTES:** "Alright say less, love."
**CHS #1:** "Alright love."

51. Based on my training and experience, I believe that in this call: CHS #1 and Miramontes are confirming their meeting time and estimated time of arrival ("Yo I'm jumping on... the freeway now." and "Alright, well just give me a little bit long, like, I'm, I'm probably gonna be like 5 minutes later than you maybe 10 so.")

52. At 4:40PM, at the direction of case agents, CHS #1 placed a connected voice call to TARGET TELEPHONE 2 (Miramontes). This call was recorded through the court authorized interception of Miramontes' phone line (TARGET TELEPHONE 2). It was also captured via the consensual recording of CHS #1's telephone number. This call was reviewed by case agents. I confirmed that this call occurred with TARGET TELEPHONE 2 by reviewing the court authorized pen register/trap and trace data for TARGET TELEPHONE 2. Below is a transcription of the relevant portion of that call:

> **MIRAMONTES:** "Yo. Alright just uh, when you pull in just be careful like, uh, you'll see the boys straight ahead but they not in our parking lot, they like around the corner."
> **CHS #1:** "Oh ok, what they doing?"
> **MIRAMONTES:** "They just parked doing something, they, they, they doing something else and shit they not worried about us and shit."
> **CHS #1:** "Ok bet, bet, bet, alright uh, you'll see me I'm coming down the frontage road right now so"
> **MIRAMONTES:** "Alright."
> **CHS #1:** "Alright bet."
> **MIRAMONTES:** "Alright love."
> **CHS #1:** "Hey you didn't bring that with you did you?"
> **MIRAMONTES:** "Uh nah, the chop, bro that, I ain't gonna lie bro that nigga had a fucking, it wasn't even, it wasn't even a chop bro."
> **CHS #1:** "What was it, a fucking"
> **MIRAMONTES:** "It was a fucking big ass fucking sniper rifle and shit."
> **CHS #1:** "(UI) sell you the fucking, what the fuck"
> **MIRAMONTES:** "Nah it was, it was a, It was literally a huge fucking sniper rifle nigga it was like a fucking, it, it was a big ass one, it was an expensive one though, it was like, it was a 50 caliber."
> **CHS #1:** "Damn for real?"
> **MIRAMONTES:** "Yeah it was a 50 caliber sniper rifle."
> **CHS #1:** (UI)
> **MIRAMONTES:** "Big as a bitch though, it was big as fuck bro."
> **CHS #1:** "800 dollars for that?"
> **MIRAMONTES:** "Yeah he wanted 800."
> **CHS #1:** "Holy shit, taxing."
> **MIRAMONTES:** "It was an automatic."
> **CHS #1:** "He might as well go hunting with the mother fucker, in fucking Africa."
> **MIRAMONTES:** "It was an automatic, it was an automatic snipe."
> **CHS #1:** "Oh for real?"
> **MIRAMONTES:** "Yeah it was an automatic snipe."

**CHS #1:** "Damn, 50 cal too?"
**MIRAMONTES:** "It was a 50 caliber, it was big as a bitch."
**CHS #1:** "Damn, shit, yeah, like 800 dollars ain't"
**MIRAMONTES:** "(UI) What the fuck I'm gonna do with that shit?"
**CHS #1:** "Shit, besides go try to shoot an elephant"
**MIRAMONTES:** "Right, like no I'm good, I was like you can keep that motherfucker he was like come on bro just give me, he's like just give me like 700 I'm like no, I wouldn't even give you 500 for that."

53. Based on my training and experience, I believe that in this call: CHS #1 is inquiring if Miramontes was bringing a firearm ("Hey you didn't bring that with you did you?") and Miramontes says that he did not ("Nah it was, it was a, It was literally a huge fucking sniper rifle nigga it was like a fucking, it, it was a big ass one, it was an expensive one though, it was like, it was a 50 caliber.") Miramontes also warns CHS #1 that the police are in a nearby parking lot and to be careful ("Yo. Alright just uh, when you pull in just be careful like, uh, you'll see the boys straight ahead but they not in our parking lot, they like around the corner.").

54. At approximately 4:35PM, TFO Zinnen met with CHS #1 at a predetermined location, searched CHS #1 and CHS #1's vehicle and found no weapons, drugs, or money. TFO Zinnen provided CHS #1 with $2650 in recorded buy money, $1650 for the crystal methamphetamine and an additional $1000 to purchase a firearm if Miramontes brought a firearm to the drug transaction. TFO Zinnen outfitted CHS #1 with recording devices and followed CHS #1 to the buy location. From the time that CHS #1 was searched by TFO Zinnen until the time that Miramontes entered CHS #1's vehicle, CHS #1 was kept under constant visual surveillance and did not make any stops or meet with anyone other than Miramontes prior to the actual controlled buy. TFO Seeger observed Miramontes arrive in Apkarian's black Mercedes (AZE 6977) in the Ikea parking lot at 4:25PM. After CHS #1 arrived at 4:52PM, TFO Seeger observed Miramontes exit the Mercedes and enter CHS #1's vehicle and then exit CHS #1's vehicle approximately 2 minutes later. TFO Zinnen later met with CHS #1 who provided TFO Zinnen

with the $1000 in surplus money and two bags of suspected crystal methamphetamine. CHS #1 and CHS #1's vehicle were searched and no drugs, weapons, or contraband were located.

55. Case agents reviewed the audio/video recording made by CHS #1 of the transaction and found it to be consistent with CHS #1's account of the transaction. The drug transaction and money exchange were clearly captured on the video, which showed Miramontes hand the crystal methamphetamine to CHS #1, who, in turn, provided Miramontes with the $1650 in buy money. Case agents later field tested and weighed the crystal methamphetamine and found the total weight to be 85.7 grams. A Nark II test kit revealed a presumptive positive reaction for the presence of methamphetamine. Miramontes was unable to supply a firearm and CHS #1 returned the surplus money to case agents.

56. On June 13, 2025, at 3:03PM, at the direction of case agents, CHS #1 placed an outgoing call to TARGET TELEPHONE 2 (Miramontes) for the purposes of obtaining a price for a half pound of crystal methamphetamine. The call was captured via the court authorized interceptions over TARGET TELEPHONE 2 and the consensual recording of CHS#1's telephone number. The call was reviewed by case agents. I confirmed that this call occurred with TARGET TELEPHONE 2 by reviewing the court authorized pen register/trap and trace data for TARGET TELEPHONE 2. Below is a transcription of the relevant portion of the call:

> **MIRAMONTES**: "My boy, (UI) sitting right here, posted in the hood. They rescheduled my court date to this week and shit."
> **CHS #1**: "Ah, it's this week?"
> **MIRAMONTES**: "Yeah, the rescheduled my shit again, this gonna be second time."
> **CHS #1**: "You should be straight then, hopefully."
> **MIRAMONTES**: "Hopefully, I hoping that shit is. What's the word though, tell me something good boy, what's the word?"
> **CHS #1**: "I'm trying to get my money together, I'm thinking prolly Monday or Tuesday. I'm just trying to get a price real quick, what you think you can get a half P for, of the..."
> **MIRAMONTES**: "Of the Tina?

**CHS #1**: "Yeah, the Tina"
**MIRAMONTES**: "Ah, I have to call dude and see what the fuck is going on and shit. You know, bro, you know me and shit bro, whatever ya'll do and shit, you know what I'm saying just, you hit my hand... if I come over there... you know what I'm saying, drop it off."
**CHS #1**: "Right, well yeah, well I mean no not Tina, I'm talking about the, the, glass. That's what I'm talking about."
**MIRAMONTES**: "Yeah the Tina, the glass.”
**CHS #1**: "Yeah, Yeah, yeah, I though you were talking about someone else."
**MIRAMONTES**: "No, no, no, that's what we call it in here, we call it Tina."
**CHS #1**: "Yeah, but um... Alright, I know you had said if I grab enough, then it'll be a price break, but."
**MIRAMONTES**: "Yeah, yeah..."
**CHS #1**: "(UI OV) something decent where we both can make some money."
**MIRAMONTES**: "Alright, let me call him and then ah, let me see what's going on."
**CHS #1**: "Alright, yeah just get me a price though, cause I know I won't be ready until like Monday."
**MIRAMONTES**: "What was the number that we was getting 'em for before, was like... 550, or some shit like that?"
**CHS #1**: "you did... You did ah... 6 the first time, cause I know I bought 3 for 18 and they bumped it down, it was 1650, took 50 off each one. So that was..."
**MIRAMONTES**: "Oh."
**CHS #1**: "550, but I remember you told me like shit, if I bought a half or something, you said you prolly get them down to 4, so..."
**MIRAMONTES**: "Yeah"
**CHS #1**: "Try to make it somewhere where it's worth your while too and then, let me know the price."
**MIRAMONTES**: "Alright, let me call him."
**CHS #1**: "Try to make something happen, make it worth mine too."
**MIRAMONTES**: "Alright, say less. Cause if that's the case, then I'll fuck around and grab it from him and then, you know what I'm saying."
**CHS #1**: "But it wouldn't be until like, Monday or Tuesday (UI) that I'm leaning for."
**MIRAMONTES**: "Yeah."
**CHS #1**: "Cause like if you need to hold onto your money, then just hold onto it (UI)."
**MIRAMONTES**: "Okay, cause what's today the... today's the 13th."
**CHS #1**: "Yup"
**MIRAMONTES**: "Okay, cause Tuesday is the day I got court."
**CHS #1**: "Tuesday, well (UI) well try to make it happen."
**MIRAMONTES**: "Alright for sure."
**CHS #1**: "Then, you know what saying?"
**MIRAMONTES**: "Yup."

**CHS #1**: "So, yeah just let me know cause my money is tied up for the weekend for sure. I would buy it for him and just hold onto it, but I... it's a little bit more than what he was talking last time, so."
**MIRAMONTES**: "Well shit, I'll do that, I'll fuck around if it... if it is a good number I'll grab it and I'll just hold onto it and shit and come Monday. So that way we have it in our possession for sure."
**CHS #1**: "Yeah, well let me know what ever you wanna do. Umm, but I won't be ready till next week for sure, it'll be Monday or Tuesday."
**MIRAMONTES**: "Alright, for sure. Well let me get you..."
**CHS #1**: "Call me back and let me know the ticket."
**MIRAMONTES**: "Alright for sure, say less."
**CHS #1**: "So i can try to put stuff in motion."
**MIRAMONTES**: "Alright, say less."
**CHS #1**: "Alright."
**MIRAMONTES**: "I give you..."

57. Based upon my training and experience, I believe that in this call CHS #1 is requesting a price for a half pound of crystal methamphetamine from Miramontes ("I'm trying to get my money together, I'm thinking prolly Monday or Tuesday. I'm just trying to get a price real quick, what you think you can get a half P for, of the..." and "Of the Tina?"). Miramontes tells CHS #1 that Miramontes will call the source of supply ("Alright, let me call him."). CHS #1 requests Miramontes to call CHS #1 when Miramontes has a price ("Call me back and let me know the ticket."). Based on my training and experience, I know that "Tina" is a term that is often used to refer to crystal methamphetamine.

58. At 3:32PM, court authorized interceptions over TARGET TELEPHONE 2 captured an outgoing connected voice call from TARGET TELEPHONE 2 to 414-340-9162 (Leflore). This call was reviewed by case agents. The call lasted 24 seconds and, in sum, Miramontes tells Leflore that Miramontes will call Leflore back in 30 minutes. Based on the timing of this call, and prior interceptions, I suspected that Leflore was Miramontes' methamphetamine supplier and would likely play a role in sourcing the methamphetamine for this buy.

59. At 3:51PM, court authorized interceptions over TARGET TELEPHONE 2 captured an incoming call from 414-340-9162 (Leflore). I confirmed that this call occurred with TARGET TELEPHONE 2 by reviewing the court authorized pen register/trap and trace data for TARGET TELEPHONE 2. This call was reviewed by case agents. The initial portion of the conversation did not relate to the TARGET OFFENSES and was minimized. The call was periodically spot checked and minimized. When the conversation was again spot checked, it had turned to discussion of the TARGET OFFENSES. Below is a transcription of the relevant portion of the call:

> **MIRAMONTES**: (*Call spot checked in mid-conversation*) "…for uh, for the twelve?"
> **LEFLORE**: "Let me see, where my phone at. Actually, stay on the phone. I'm finna call him right now." (*at approximately 3:57:30PM*)
> *(Leflore places Miramontes on hold for approximately one minute)*
> **LEFLORE**: "On my momma, damn you hear me.
> **MIRAMONTES**: "What up?"
> **LEFLORE**: "I just asked him, he said he don't got it like all on him so he gonna ask, he finna call his people and see if he can work something out. Like if his brother will do it or something."
> **MIRAMONTES**: "Yeah, if they- if they do it for the- if they do it for twelve hundred brah I'd grab it right now and shit."
> **LEFLORE**: "Damn, I just scratched the- her shit up. Her shit was already fucked up. [UI]."
> **LEFLORE**: "Um… I call- I called him and asked him, waiting on him to call me back. [UI], how you been?

60. Based on my training and experience, I believe in this call Miramontes is trying to obtain a half pound of crystal methamphetamine for $1200 ("…for uh, for the twelve?"). Leflore places Miramontes on hold to contact Leflore's source of supply for crystal methamphetamine ("Let me see, where my phone at. Actually, stay on the phone. I'm finna call him right now."). After speaking with Leflore's supplier on the other line, Leflore tells Miramontes that Leflore's supplier does not have the full half pound of methamphetamine and that Leflore's supplier may have to contact the supplier's brother to acquire additional methamphetamine ("I just asked him,

he said he don't got it like all on him so he gonna ask, he finna call his people and see if he can work something out. Like if his brother will do it or something").

61. Based on the timing of this call, I suspected that Leflore spoke to his methamphetamine source of supply at approximately 3:57PM while he placed Miramontes on hold. I reviewed the pen register/trap and trace records for Leflore (414-340-9162) and found that at 3:57PM, while still on the call with Miramontes, 414-340-9162 placed an outgoing connected voice call to **414-252-9913** (**Target Cell Phone)**. This call lasted approximately 1 minute and 52 seconds, which is the same approximate amount of time that Miramontes was on hold before Leflore rejoined the conversation and had clearly just spoken to his methamphetamine supplier.

62. Based on my training, experience, and context of the above calls, I believe that Dale Fisher is Leflore's source for crystal methamphetamine and that Fisher would likely supply the methamphetamine ordered by CHS #1. Further, I reviewed pen register and trap and trace data for **414-252-9913** (**Target Cell Phone)** and observed that **414-252-9913** (**Target Cell Phone)** had four connected voice calls with 414-690-5040 (Ryan Fisher) at 4:35PM, 5:02PM, 5:10PM, and 5:26PM that lasted 1 minute and 14 seconds, 57 seconds, 21 seconds, and 6 seconds respectively.

63. Case agents determined telephone number 414-690-5040 is connected to Ryan Fisher based on (1) a query through the CashApp platform shows the number linked to the account name "Ryan Fisher;" (2) subscriber records obtained from US Cellular on June 16, 2025 show the account holder to be "Ryan Fisher" with "Andrea Wilcox" listed as an authorized user; and (3) the number is listed as Ryan Fisher's in a Milwaukee County Sheriff's Office traffic stop that occurred on April 17, 2025. Based on this, I believe that Dale Fisher contacted his brother, Ryan Fisher, to discuss sourcing the methamphetamine to Leflore. I believe this further confirms that Dale Fisher

is the supplier that Leflore was referencing in his conversation with Miramontes. Thus, I believe that Dale Fisher is using **414-252-9913** (**Target Cell Phone)** to commit the TARGET OFFENSES.

64. At 5:37PM, court authorized interceptions over TARGET TELEPHONE 2 captured a connected voice call from Leflore (414-340-9162) to Miramontes. This call was reviewed by case agents. I confirmed that this call occurred with TARGET TELEPHONE 2 by reviewing the court authorized pen register/trap and trace data for TARGET TELEPHONE 2. Below is a transcription of the relevant portion of the call:

> **MIRAMONTES**: "J-Dizzle"
> **LEFLORE**: "The best he could do was seventeen five."
> **MIRAMONTES**: "Man that's too steep for me right there."
> **LEFLORE**: [OV] "That's way too steep bro."
> **MIRAMONTES**: "Yeah I ain't gonna be able to make no dollar off that."
> **LEFLORE**: "Yeah…"
> **MIRAMONTES**: "Did uh… did the other guy…"
> **LEFLORE**: [OV] "[UI], that's- that's- that's- that's you going through- I- that's me not even being there. That's- you know what I'm saying? I'll pull up- I'll pull up with you though."
> **MIRAMONTES**: "I'm already knowing."
> **LEFLORE**: [OV] "You know what I'm saying? Make sure everything- but that's- that's you getting straight to him,[UI] you know what I'm saying?"
> **MIRAMONTES**: "Yeah."
> **LEFLORE**: "On my momma."
> **MIRAMONTES**: "Shit uh, if anything, I'll let you know and shit. I'm a shop around for some better numbers and shit bro."
> **LEFLORE**: "Alright let me…Okay, let me call somebody that can actually see what they gonna do."
> **MIRAMONTES**: "Alright, for sure [UI]."
> **LEFLORE**: [OV] "Hey if I can't- if I can't get it to that, like, what you think bro, like fifteen, sixteen, fourteen?"
> **MIRAMONTES**: Like, like the- like the most and shit I'll pay bro, honestly, shit, is like fourteen."
> **LEFLORE**: "Okay, that's cool"
> **MIRAMONTES**: "And that and that and and then I'm only gonna make- I'm only gonna make me a little couple of dollars and shit. That really ain't…"
> **LEFLORE**: "I feel you."
> **MIRAMONTES**: "Now if I would have got it for- if I would have got it for that twelve and shit bro? That'd been decent and shit. I'd a been good with that."
> **LEFLORE**: "Yeah, okay let me see [UI]."
> **MIRAMONTES**: "But I'll- I'll… I already know and shit."

**LEFLORE**: "Alright, let me- let me make this call real quick to some bros, see what he gonna say."
**MIRAMONTES**: "Yeah dude, let me know."
**LEFLORE**: "Alright, [UI]."
**MIRAMONTES**: "Alright, love."

65. Based on my training and experience, I believe in this call that Leflore is telling Miramontes that the best price for the half pound of crystal methamphetamine from Leflore's source of supply is $1750 ("The best he could do was seventeen five.").

66. I reviewed the pen register/trap and trace records for 414-340-9162 and found that between the above call at 5:37PM and the below call at 5:51PM 414-340-9162 had the following calls: Outgoing call at 5:39PM to 414-491-2741 lasting 45 seconds, outgoing call at 5:42PM to 262-745-3152 lasting 1 minute 30 seconds, incoming call at 5:45PM from **414-252-9913 (Target Cell Phone)** (Dale Fisher) lasting 56 seconds, outgoing unanswered call to 262-225-8217 at 5:46PM, outgoing unanswered call at 5:47PM to TARGET TELEPHONE 2 (Miramontes) lasting 1 minute and 4 seconds, and an incoming call from 262-225-8217 at 5:48PM lasting 1 minute and 51 seconds.

67. At 5:51PM, court authorized interceptions over TARGET TELEPHONE 2 captured a connected voice call to Leflore (414-340-9162) from Miramontes. This call was reviewed by case agents. I confirmed that this call occurred with TARGET TELEPHONE 2 by reviewing the court authorized pen register/trap and trace data for TARGET TELEPHONE 2. Below is a transcription of the relevant portion of the call:

**LEFLORE**: "[UI] cause I swear to God, I ain't making nothing [UI]."
**MIRAMONTES**: "That's the- that's the thing bro, cause I- I [UI]. I- I don't grab it unless my people need it and shit. That's all I'm saying nigga. I- If I grab a whole thing, then I'm a just basically be sitting on another half- half a HP, know what I'm saying?"
**LEFLORE**: "For Lord knows how long?"
**MIRAMONTES**: "Yeah. That's what I said."

**MIRAMONTES**: "Yeah. But I'm gonna go out through the back. I ain't going through the front. But uh, what's that called? The…" (*Miramontes having conversation in background*)
**LEFLORE**: [OV] "Just call me [UI]."
**MIRAMONTES**: [OV] "Just give me a little bit. I'll fuck around- I'll fuck around and grabbed it."
**MIRAMONTES**: [OV] "That's just for… is it- I'll fuck around and do grab it? I just gotta be…"
**LEFLORE**: "And just hold out on it bro!"
**LEFLORE**: "either hold out on it, you know what I'm saying? Or, shit like, do you want me to hold it? If you don't want to sit at one spot, cause I know you- you moving right now. You see what I'm saying?"
**MIRAMONTES**: "Yeah."
**LEFLORE**: "I know you on that type of [UI] shit. I mean if you… you [UI]."
**MIRAMONTES**: "I mean if I grab it. If I grab it, I'mma try to get rid of it, but it's at the- I'd rather not… try to [UI]. I ain't gonna lie, I'm- I'm in the process of dumping a bunch of- bunch of- uh, Yings and shit right now, yeah bro."
**LEFLORE**: "[UI]. So you can't really be [UI] like that."
**MIRAMONTES**: "Nah, hell nah. I just got a whole ten pack in and some- you know what I'm saying, some, gas and shit, and I ain't.."
**LEFLORE**: "Let's go! Hold on bud, stay on the phone, hold on, stay on the phone"
**LEFLORE**: "For real? You're dumping! You dumping bro! Alright, um… yeah, hey Joe!"
**LEFLORE**: "Shit, he uh… [UI] gonna be there. Hey, [UI] let me call you right back [UI]. Uh, hey Joe. I mean…"
**MIRAMONTES**: "[UI]."
**LEFLORE**: "Let me see if I can call, like, let me see who I call, one more person"
**MIRAMONTES**: "I don't need it, I don't need it, I don't need it right now, but I need it- I need it definitely before Monday for sure."
**LEFLORE**: "Okay. Ahhh, okay okay, so then look, let me make one more- two more calls and I'mma call you back and see what I can, like, anything changed or not."
**MIRAMONTES**: "Alright good lookin.[UI]"
**LEFLORE**: "Cause I think I might know one more person, no bullshit."
**MIRAMONTES**: "Alright, and then uh… we- me and- me and cuz,, I mean he's just waiting on me, but we down to finna come and grab another one from you and shit."
**LEFLORE**: "Alright, like a Zap?"
**MIRAMONTES**: "Yeah."
**LEFLORE**: "Okay, I'm ready."
**MIRAMONTES**: "Alright, I'll let you know when uh, when we- we gonna be on the way and shit. We gonna link up."

68. Based on my training and experience, I believe in this call Leflore is telling Miramontes that Leflore will not make any money at the price Miramontes is requesting for the

crystal methamphetamine ("…cause I swear to God, I ain't making nothing…"). Miramontes tells Leflore that Miramontes does not want to obtain a whole pound of crystal methamphetamine because then Miramontes will be stuck with a half a pound leftover ("That's the- that's the thing bro, cause I- I [UI]. I- I don't grab it unless my people need it and shit. That's all I'm saying nigga. I- If I grab a whole thing, then I'm a just basically be sitting on another half- half a HP, know what I'm saying?"). Miramontes tells Leflore that Miramontes does not need the crystal methamphetamine right away but will need it by Monday ("That's the- that's the thing bro, cause I- I [UI]. I- I don't grab it unless my people need it and shit. That's all I'm saying nigga. I- If I grab a whole thing, then I'm a just basically be sitting on another half- half a HP, know what I'm saying?"). Miramontes then tells Leflore that Miramontes will be on the way with Miramontes' cousin to obtain another ounce of an unknown controlled substance from Leflore ("Alright, and then uh… we- me and- me and cuz, I mean he's just waiting on me, but we down to finna come and grab another one from you and shit."). This additional deal between Leflore, Miramontes, and Miramontes' cousin, does not appear to be connected to the methamphetamine deal involving CHS #1.

69. I reviewed the pen register/trap and trace records for 414-340-9162 and found that after the above call 414-340-9162 had one connected voice calls with **414-252-9913** (**Target Cell Phone)** (Dale Fisher) on June 13, 2025 at 7:15PM lasting 1 minute 14 seconds. Between the June 13th call with TARGET TELEPHONE 2 (Miramontes) at 5:51PM and the below call on June 16, 2025 at 2:29PM with TARGET TELEPHONE 2 (Miramontes), Leflore (414-340-9162) had 418 contacts via voice calls or text messages with 44 unique phone numbers. Nonetheless, based on the context and timing of the intercepted communications between TARGET TELEPHONE 2 and 414-340-9162 (Leflore), coupled with the pen register/trap and trace and location records for 414-

340-9162 (Leflore), I believe that Dale Fisher (**414-252-9913**) and (**414-888-2248**) (**Target Cell Phones)** is the source of the crystal methamphetamine later obtained on June 16, 2025 by Leflore.

70. On June 16, 2025, at 2:03PM, at the direction of case agents CHS #1 placed an outgoing call to TARGET TELEPHONE 2 (Miramontes) for the purposes of obtaining a half pound of crystal Methamphetamine. The call was captured via the court authorized interceptions over TARGET TELEPHONE 2 and the consensual recording of CHS#1's telephone number and reviewed by case agents. I confirmed that this call occurred with TARGET TELEPHONE 2 by reviewing the court authorized pen register/trap and trace data for TARGET TELEPHONE 2. Below is a transcription of the relevant portion of the call:

**MIRAMONTES**: "Yo"
**CHS #1** - "Trying to see if you ever like, got that price for me. I'm damn near ready today"
**MIRAMONTES**: "I been waiting on dude and shit bro, he fuck around, let me call this nigga and shit"
**CHS #1**: "Let me know. Give me the, give me a um price for the half a one if you can. See if he got that much or whatever let me know. Let me know quick if you can, cuz um, shit I'm not gonna have the bread for a little while."
**MIRAMONTES**: "Alright fo sho, I got, I got you and shit. We can fuck around. We gotta make it happen today then?"
**CHS #1**: "Shit if we can hell yeah cuz"
**MIRAMONTES**: "Yeah, we can, we can try to do that and shit, bro look it, look it he finna pimp her bro, he finna pimp her. look, look, look he finna pimp her out" (laughs) "That shit's hilarious nigga" (OV) "It ain't even 1 o'clock yet, Hello?"
**CHS #1**: "I said, you say you got court tomorrow don't you?"
**MIRAMONTES**: "I got, uh no it's on Wednesday"
**CHS #1**: "Oh Okay, well yeah shit"
**MIRAMONTES**: "On Wednesday"
**CHS #1**: "Yeah if we can" (OV)
**MIRAMONTES**: "Yeah, we can, we can try to make that happen, matter fact, we can fuck around try to make it happen right now"
**CHS #1**: "Yeah shit, let me know then the ticket cuz, I ain't got the bread yet but I gotta let dude know to press so I can try to put mine at, put my on there too".
**MIRAMONTES**: "I already know"
**CHS #1**: "Let me know then a price on the half a one
**MIRAMONTES**: "Alright, say less, love brody"
**CHS #1**: "Alright, love bro"

71. Based on my training and experience, I believe in this call CHS #1 is following up on the call from June 13, 2025, and asking Miramontes for a price on the crystal methamphetamine ("Trying to see if you ever like, got that price for me. I'm damn near ready today"). Miramontes says he will call the source and find out ("I been waiting on dude and shit bro, he fuck around, let me call this nigga and shit"). Miramontes tells CHS #1 that Miramontes will try to make the deal happen right away ("Yeah, we can, we can try to make that happen, matter fact, we can fuck around try to make it happen right now").

72. I reviewed the pen register/trap and trace records for TARGET TELEPHONE 2 and 414-340-9162 (Leflore) and found that at 2:25PM TARGET TELEPHONE 2 receives an incoming answered call from 414-340-9162 which lasts 51 seconds. Due to technical problems this call was not recorded or monitored. Immediately following this call the pen register/trap and trace records show 414-340-9162 (Leflore) place an outgoing call to **414-252-9913 (Target Cell Phone**) (Dale Fisher) at 2:26PM which goes unanswered, another outgoing call to **414-888-2248 (Target Cell Phone**) (Dale Fisher) at 2:27PM which goes unanswered, and a third call to **414-252-9913 (Target Cell Phone**) (Dale Fisher) at 2:27 which lasts for 2 minutes and 4 seconds. Immediately after the connected call with **414-252-9913 (Target Cell Phone**) (Dale Fisher) 414-340-9162 (Leflore) places the call in the below paragraph.

73. On June 16, 2025, at 2:29PM, court authorized interceptions over TARGET TELEPHONE 2 captured a connected voice call from Leflore (414-340-9162) to Miramontes. This call was reviewed by case agents. I confirmed that this call occurred with TARGET TELEPHONE 2 by reviewing the court authorized pen register/trap and trace data for TARGET TELEPHONE 2. This call appears to be in response to Miramontes calling Leflore at 2:05PM, which went unanswered. Additionally, I reviewed the pen register/trap and trace records for TARGET

TELEPHONE 2 and 414-340-9162 (Leflore) and found that Miramontes had sent a text message to 414-340-9162 at 2:22PM. Below is a transcription of the relevant portion of the 2:29 PM call:

> **LEFLORE**: "He said he'll do fourteen, but after this he ain't really feeling that way bro, he really want fifteen for it and if he gon do it like, he like man if you trying to get low you gotta go grab a whole one bro. That's only way"
> **MIRAMONTES**: "Alright, alright"
> **LEFLORE**: "He said he'll do it for, I'm like bro I asked him like please for me bro cuz you know I don't want to fuck up business you know what I'm saying, for me please?"
> **MIRAMONTES**: "Yeah"
> **LEFLORE**: "He like alright, he'll do it. So he gon do it for fourteen. So I'm gonna have you just like near pull up, cuz I'm finna, waiting on him to call me back"
> **MIRAMONTES**: "You just blessed me nigga"
> **LEFLORE**: "Yeah I'm finna, on my life, I'm finna call and see if uh like if his bitch coming. And then like, when he, when he come I mean, I'll give em the paper or shit, get it or if you know know I really don't wanna charge this me same time, you know what I'm saying?"
> **MIRAMONTES**: "Yeah"
> **LEFLORE**: "Or at least get in the area, cuz I ain't gon really want that shit"
> **MIRAMONTES**: "I got you, I'm a be right there, right by you"
> **LEFLORE**: "Alright, okay, I'm a call you as soon as he give me the call, swear to God"
> **MIRAMONTES**: "Alright, love bro"
> **LEFLORE**: "Alright, love bro"

74. Based on my training and experience, I believe in this call Leflore is telling Miramontes that Leflore's source of supply has agreed to sell the half pound of crystal methamphetamine for $1400 this time, but going forward, Miramontes would have to purchase a full pound to get a discount ("He said he'll do fourteen, but after this he ain't really feeling that way bro, he really want fifteen for it and if he gon do it like, he like man if you trying to get low you gotta go grab a whole one bro. That's only way"). Leflore tells Miramontes that Miramontes will have to be in the general area so Leflore does not have to have that much crystal methamphetamine in Leflore's possession for long ("Or at least get in the area, cuz I ain't gon really want that shit"). Miramontes agrees ("I got you, I'm a be right there, right by you"). Leflore says he will call

Miramontes as soon as Leflore gets the call from the methamphetamine source ("Alright, okay, I'm a call you as soon as he give me the call, swear to God").

75. Between 2:41PM and 2:44PM, CHS #1 had the following text message exchange with TARGET TELEPHONE 2 (Miramontes) which TFO Baclawski confirmed was sent by reviewing the messages on CHS #1's phone:

> **MIRAMONTES**: "Yoo"
> **CHS #1**: "Wtw" (What's the word)
> **CHS #1**: "Tell me some good….. need a decent ticket so I can make some cash. It's been slow for me. "

76. Based on my training and experience, I believe CHS #1 is requesting a good price on the crystal methamphetamine ("…need a decent ticket…") and to find out if Miramontes is progressing the deal.

77. At 2:46PM, at the direction of case agents CHS #1 placed an outgoing call to TARGET TELEPHONE 2 (Miramontes). The call was captured via the court authorized interceptions over TARGET TELEPHONE 2 and the consensual recording of CHS#1's telephone number and reviewed by case agents. I confirmed that this call occurred with TARGET TELEPHONE 2 by reviewing the court authorized pen register/trap and trace data for TARGET TELEPHONE 2. Below is a transcription of the relevant portion of the call:

> **MIRAMONTES**: "So, there's two, there's two people, I got two different prices and shit. One, one of them's five, the other one's four, uh four seventy-five"
> **CHS #1**: "For a half?"
> **MIRAMONTES**: "For a HP"
> **CHS #1**: "Damn, five K?"
> **MIRAMONTES**" "No it's, no it's uh it's five hundred per zip, or four seventy, four seventy-five per zip"
> **CHS #1**: "Yeah, Oh okay, alright, Ummm"
> **MIRAMONTES**: "No not five K, not five K"
> **CHS #1**: "But that's with your, with you" (OV)
> **MIRAMONTES**: "That's with, that's, those are two different dudes, so it's up to you whichever one you want to go to both of them got some fire, I ain't gon lie. Except one dude and shit, like the nigga that got that five hundred dollar shit, his

shit actually be that, I ain't gon lie. The other nigga got some fire to and shit, it's just that, fucking, his little brother and shit like, he's the one that be fucking getting the shit so it's like he's a third, he doesn't have it his self, he goes to a third party."
**CHS #1**: "Yeah, so shit, damn I'm a get fifty dollar price break if we grab eight though?"
**MIRAMONTES**: "Yeah"
**CHS #1**: "Damn"
**MIRAMONTES**: "Unless we go, unless we go to this nigga on the north side and shit bro, but I really don't like fucking with niggas over there bro because them niggas be shiesty ball and shit, it's like dealing with black people and shit"
**CHS #1**: "Yeah, damn I was kind of expecting to get it down to like four at least"
**MIRAMONTES**: "Yeah, I can try to, I can still try to shop around and shit, still try to get you know what I"m saying?"
**CHS #1**: "I want you to go with the mother fucker who's the most dependable and probably got the best just cuz you know I" (OV)
**MIRAMONTES**: "They, they, they both, they both are dependable and shit you know what I'm saying, obviously we want the best number and shit"
**CHS #1**: "Yeah"
**MIRAMONTES**: "But the niggas that like, we can, we can get a cheaper number, it's just probably gon be on the north side and it ain't no tellin, it ain't no tellin if that shit gon be valid or not bro cuz them niggas, I don't buy shit from the north side nigga and that shit was, it was, it wasn't shit, it was fake"
**CHS #1**: "Yeah"
**MIRAMONTES**: "Like it'll be like two, it will be like, probably like four, like six real ones and then like the last two be fake or some shit"
**CHS #1**: "Right"
**MIRAMONTES**: "That's what they usually be doing and shit, like they be trying to pull fast ones and shit, and I really don't deal with they ass' over there"
**CHS #1**: "What happened to the dude we, I remember you had told me last time like if I had bought uh uh at least a cutie, you could get it down to like four-fifty"
**MIRAMONTES**: "Oh yeah, dude's little bitch ass, he ain't been trying to answer my phone calls and shit, but I been calling that nigga, back to back to back. That was my, that's the main nigga that we need to go through and shit"
**CHS #1**: "Yep, I mean what's what's, is there a price like" (OV)
**MIRAMONTES**: "If we go through him nigga, we both make some money, but that bitch ass nigga ain't trying to answer the phone"
**CHS #1**: "Right, so I mean is there gon be like a, a, a crazy price break if I, if it goes for a whole p?"
**MIRAMONTES**: "It's gotta be all crystal"
**CHS #1**: "I'm saying like if a mother fucker gets a whole P is it gon be like a, a crazy price break on it? Cuz shit"
**MIRAMONTES**: "If we get a whole, if we get a whole P and shit bro, I ain't gon lie, I'll fuck around and end up going to Illinois for it"
**CHS #1**: "Yeah"
**MIRAMONTES**: "So I'll have to go pick it up from Illinois"

**CHS #1**: "You think you'd have to take that, that long of a trip? Dude, the dude, the dude out there" (OV)
**MIRAMONTES**: "I would have to and shit bro because all, everybody up here and shit, all the cooks up here and shit, they all not. So ain't nobody over here cooking shit and anybody's getting anything bro, they going down there and grabbing it and shit, so if I go down there and shit I have to like, you know what I'm saying I gotta call, arrange that shit, all type of shit."
**CHS #1**: "Right"
**MIRAMONTES**: "And then I gotta figure out who the person is and shit cuz like I, you know what I'm saying just not anybody gon give me they fucking plug and shit. They gon be on some funny shit, cuz they gon want to keep me in they pocket."
**CHS #1**: "Yeah, so that, that, the, the half a P is doable?"
**MIRAMONTES**: "The half a P is doable right now and shit, we can do it right now, everything's there" (OV)
**CHS #1**: "You can try to get the, the best one, you can't get it down to four-fifty? I mean"
**MIRAMONTES**: "I can, I can tell him and shit, I can, well I can tell him, well I can"
**CHS #1**: "Bro I ain't gone lie"
**MIRAMONTES**: "I'll have to lie to the nigga and shit"
**CHS #1**: "yeah cuz I, bro I ain't gone lie like shit I thought it was gon be a little bit cheaper cuz i remember, you had damn near, throw me that other number so I had already kinda told dude like I could get it down to like five a zip, but that's I was saying five a zip with me hopefully making at least like a hundred dollars a zip."
**MIRAMONTES**: "Right"
**CHS #1**: "But shit, umm, I mean if you can, like, like if you can get down to four-fifty so I can at least make fifty bucks a zip"
**MIRAMONTES**: "Yeah"
**CHS #1**: "That'll be straight."
**MIRAMONTES**: "Yeah, cuz I'll be straight with a little, you know I'm saying, a little, a little couple dollars and shit when we, you know what I'm saying, I'm just dropping it off to you and shit, so I'm you know what I'm saying whatever you give me off that and shit, that's really what the fuck I go off of and shit."
**CHS #1**: "Alright" (OV)
**MIRAMONTES**: "I really just like getting, getting the shit, getting it going and shit, cuz I know don't nobody, can't nobody else get it going and shit bro, and you just so happen to be one of the only peoples I know that'll grab em and shit."
**CHS #1**: "Right, I mean if it, cuz I, let me see" (OV)
**MIRAMONTES**: "Give me, give me like, give me like ten minutes, let me call you right back."
**CHS #1**: "Call me right back"
**MIRAMONTES**: "Alright, love"

78. Based on my training and experience, I believe in this call Miramontes is provided the price for the crystal methamphetamine to CHS #1 ("No it's, no it's uh it's five hundred per zip,

or four seventy, four seventy-five per zip"). Miramontes indicates that he should be able to do the deal today ("The half a P is doable right now and shit, we can do it right now, everything's there").

79. At 3:18PM, court authorized interceptions over TARGET TELEPHONE 2 captured a connected voice call to Leflore (414-340-9162) from Miramontes. This call was reviewed by case agents. I confirmed that this call occurred with TARGET TELEPHONE 2 by reviewing the court authorized pen register/trap and trace data for TARGET TELEPHONE 2. Below is a transcription of the relevant portion of the call:

> **MIRAMONTES**: "J-Dizzle!”
> **LEFLORE**: " [UI] up on you bro but the only problem is bro I-I just came up here shopping with bro real quick bro I'm at Mayfair foolin my [UI] cuz you know what I'm sayin you in a huge rush? "
> **MIRAMONTES**: "How long you thinkin until you're done?"
> **LEFLORE**: "Like 30..20-30..like 30 till I'm done."
> **MIRAMONTES**: "That's fine."
> **LEFLORE**: "All together I feel hopefully-hopefully be up over there in like 35."
> **MIRAMONTES**: "That's fine."
> **LEFLORE**: "Okay that's working cuz."
> **MIRAMONTES**: "Yeah that's fine."
> **LEFLORE**: "Alright I'm gonna call you in a little bit."
> **MIRAMONTES**: "Alright for sure love bro."
> **LEFLORE**: "Love bro."

80. Based on my training and experience, I believe in this call Leflore is telling Miramontes that Leflore is currently at the Mayfair Mall and questions how soon Miramontes needs the methamphetamine (“I'm at Mayfair foolin my [UI] cuz you know what I'm sayin you in a huge rush?") Leflore says he hopes to be on the way in approximately 30 minutes ("Like 30..20-30..like 30 till I'm done.")

81. At 3:55PM, CHS #1 sent the following text message to TARGET TELEPHONE 2 (Miramontes) which TFO Baclawski confirmed was sent by reviewing the message on CHS #1’s phone.

> **CHS #1:** “Lmk then tryna make it happen soon if possible”

82. Based on my training and experience, I believe CHS #1 is requesting and update from Miramontes regarding the status of the methamphetamine deal and urging Miramontes to make it happen as soon as possible.

83. At 4:01PM, court authorized interceptions over TARGET TELEPHONE 2 captured a connected voice call from Leflore (414-340-9162) to Miramontes. This call was reviewed by case agents. I confirmed that this call occurred with TARGET TELEPHONE 2 by reviewing the court authorized pen register/trap and trace data for TARGET TELEPHONE 2. Below is a transcription of the relevant portion of the call:

> **LEFLORE**: "Yo."
> **MIRAMONTES**: "Yo alright um...I'm taking my cousin to the crib cuz he got that bracelet and then I'll shoot over there."
> **LEFLORE**: "Alright perfect perfect."
> **MIRAMONTES**: "Alright love bro."
> **LEFLORE**: "Love bro."

84. Based on my training and experience, I believe in this call Miramontes is telling Leflore that Miramontes has to drop his cousin off and then Miramontes will be on the way to meet Leflore to consummate the methamphetamine deal ("Yo alright um...I'm taking my cousin to the crib cuz he got that bracelet and then I'll shoot over there.")

85. I reviewed the pen register/trap and trace records for 414-340-9162 and found that immediately after the above call with Miramontes, 414-340-9162 placed an outgoing call to **414-888-2248 (Target Cell Phone)**, which lasted 13 seconds. Based on my training and experience, I know it is common for drug traffickers to contact their suppliers before, during, and after drug deals to discuss prices and confirm the status of current and future drug supplies. Based on my training and experience, and my knowledge of this investigation, I believe that Leflore contacted

Dale Fisher, his likely methamphetamine source, to advise Dale Fisher that the deal with Miramontes was progressing.

86. At 4:03PM, at the direction of case agents, CHS #1 placed an outgoing call to TARGET TELEPHONE 2 (Miramontes). The call was captured via the court authorized interceptions over TARGET TELEPHONE 2 and the consensual recording of CHS#1's telephone number and reviewed by case agents. I confirmed that this call occurred with TARGET TELEPHONE 2 by reviewing the court authorized pen register/trap and trace data for TARGET TELEPHONE 2. Below is a transcription of the relevant portion of the call:

> **MIRAMONTES**: "Yoo."
> **CHS #1**: "You say what?"
> **MIRAMONTES**: "I'm meeting up with him right now."
> **CHS #1**: "You gonna be able to get the whole half then?"
> **MIRAMONTES**: "Yeah"
> **CHS #1**: "Alright, so for good then?"
> **MIRAMONTES**: "Yea"
> **CHS #1**: "Alright well uhh"
> **MIRAMONTES**: "You want me to shoot over by you?"
> **CHS #1**: Yeah, uh you still got the addy from, from the last time?"
> **MIRAMONTES**: "Yeah, you wanna resend it?"
> **CHS #1**: "You say what?"
> **MIRAMONTES**: "You wanna resend the addy from last time?"
> **CHS #1**: "Yeah, how long you thinking?'
> **MIRAMONTES**: "Prolly like, realistically like an hour and shit, I gotta drop my cousin off, and then I gotta bust one more move and then to you"
> **CHS #1**: "Alright so realistically let's do like 5:30 then, and I'll send you an addy."
> **MIRAMONTES**: "Alright bet, bet that's enough time then."
> **CHS #1**: "That works"

87. Based on my training and experience, I believe in this call Miramontes is confirming with CHS #1 that the methamphetamine deal will happen around 5:30PM and CHS #1 will send Miramontes the address ("Alright so realistically let's do like 5:30 then, and I'll send you an addy."). CHS #1 confirms the total price to be $4000 ("So 4 good then").

88. At approximately 4:23PM, TFO Seeger was conducting surveillance 5167 N 31st Street, Milwaukee, Wisconsin, which is the known residence of Dale Fisher. TFO Seeger observed an Audi SUV, bearing Wisconsin registration license plate AZX3564 (Audi) exiting the alleyway behind Fisher's residence. Case agents review law enforcement databased and determined the Audi was registered to Tiffany Delaney, determined to be Leflore's mother based on Wisconsin Department of Correction records. Other physical surveillance units attempted to follow the Audi, however lost sight of the Audi, believed to be operated by Leflore, due to the driver's erratic operation and heavy traffic. Based on my training and experience, I believe that Leflore met with Dale Fisher at this residence and obtained the half pound of crystal methamphetamine ordered by Miramontes.

89. At 4:23PM, court authorized interceptions over TARGET TELEPHONE 2 captured a connected voice call to Leflore (414-340-9162) from Miramontes. This call was reviewed by case agents. I confirmed that this call occurred with TARGET TELEPHONE 2 by reviewing the court authorized pen register/trap and trace data for TARGET TELEPHONE 2. Below is a transcription of the relevant portion of the call:

> **LEFLORE**: "[UI] Midtown bro."
> **MIRAMONTES**: "Hey I'mma be-I'mma be on Carmen closest to you"
> **LEFLORE**: "Carmen or Forest?"
> **MIRAMONTES**: "Carmen and hold on let me see."
> **LEFLORE**: "What is wrong with you man, I thought it was going to be a super ultra....I got a thing man, honest a thing bro." (*talking to someone in the background)*
> **MIRAMONTES**: "Hold on.....holy shit never mind."
> **LEFLORE**: "Yeah uh you might as well meet me on Capitol then cuz."
> **MIRAMONTES**: "No no no never mind I was only goin that way cuz somebody needed something bro but I didn't know nigga somebody tried to hit me up for fuckin a tre-five and shit and it's all the way in Silver Spring and shit I ain't doin that and shit."
> **LEFLORE**: "Shit."
> **MIRAMONTES** "I'll meet you on the north though, I'll still meet you though."
> **LEFLORE**: "Yeah...I...yeah JD - I'm JDIZZLE."

**MIRAMONTES**: "Meet me on uhhhh damn ..... Meet on north."
**LEFLORE**: "I don't know my numbers....aight king...."
**MIRAMONTES**: "Meinecke you wanna meet me on Meinecke? You wanna meet me on 4-5 and Meinecke?"
**LEFLORE**: "Yeah yeah I can do that cuz I can do that blood."
**MIRAMONTES**: "Aight say less I'm gonna be on my way there right now."
**LEFLORE**: "Aight I'm finna be on my way right now."

90. Based on my training and experience, I believe in this call Miramontes and Leflore are arranging to meet in the area of 45th and Meinecke for Miramontes to obtain the crystal methamphetamine ("Meinecke you wanna meet me on Meinecke? You wanna meet me on 4-5 and Meinecke?")

91. Between 4:30PM and 6:12PM, CHS #1 had the following text message exchange with TARGET TELEPHONE 2 (Miramontes) which TFO Baclawski confirmed was sent by reviewing the messages on CHS #1's phone.

**CHS #1**: "Lmk when u getting ready to leave out bro so I got time to get my kids taken care of before" *(CHS #1 sends image of meeting location which is Flex Fitness in Racine, Wisconsin)*
**MIRAMONTES**: "37 minuets"
**MIRAMONTES**: "6:15 eta"
**CHS #1**: "bet"
**CHS #1**: "You close?"
**CHS #1**: "I'm going to head that way now"
**MIRAMONTES**: "6:44"

92. Based on my training and experience, I believe that in these messages CHS #1 is sending Miramontes an address where they will meet to conduct the methamphetamine deal and Miramontes agrees to meet at 6:44 PM ("Lmk when u getting ready to leave out bro so I got time to get my kids taken care of before" and "6:44").

93. Based on my training and experience, I believed that Miramontes would meet with Leflore to obtain the methamphetamine that Leflore had acquired from Dale Fisher and that, after doing so, Miramontes would meet with CHS #1 to consummate the transaction.

94. At 4:50PM, court authorized interceptions over TARGET TELEPHONE 2 captured a connected voice call to Leflore (414-340-9162) from Miramontes. This call was reviewed by case agents. I confirmed that this call occurred with TARGET TELEPHONE 2 by reviewing the court authorized pen register/trap and trace data for TARGET TELEPHONE 2. Below is a transcription of the relevant portion of the call:

> **MIRAMONTES**: "Yo...you like 40 seconds away?"
> **LEFLORE**: "40 seconds."
> **MIRAMONTES**: "Aight."
> **LEFLORE**: "Aight."
> **MIRAMONTES**: "Love."

95. Based on my training and experience, I believe in this call Miramontes is updating Leflore on the time Miramontes will soon arrive to acquire the methamphetamine from Leflore ("Yo...you like 40 seconds away?").

96. Physical surveillance was deployed to the meeting location of 45th Street and Meinecke Avenue in Milwaukee, Wisconsin. At 4:49PM, TFO Seeger observed the Audi, believed to being operated by Leflore, arrive in the area and park on the side of the street. TFO Rasmussen observed Miramontes arrive in the area in Apkarian's black Mercedes Benz (AZE-6977) and park on the side of the road approximately a block away. A few minutes later, the Audi pulled up next to the Mercedes and Miramontes got into the Audi. TFO Seeger observed Miramontes exit the Audi and enter back into the Mercedes. Both vehicles left the area. Case agents attempted to follow the Mercedes, but lost sight of the vehicle in heavy traffic.

97. Based on my training and experience, I believe that Miramontes arrived in the Mercedes and met with Leflore in the Audi, where Leflore supplied Miramontes with the half pound of methamphetamine that Miramontes would later sell to CHS #1.

98. TFO Jason Baclawski met with CHS #1 at a predetermined location and searched CHS #1 and CHS #1's vehicle. No money, drugs, or weapons were found. TFO Baclawski provided CHS #1 with $4000 in buy money and outfitted CHS #1 with audio/video recording devices at 6:49PM and followed CHS #1 to the buy location at Flex Fitness parking lot, 2400 Rapids Drive, Racine, Wisconsin. TFO Baclawski maintained constant moving surveillance of CHS #1 as CHS #1 drove from the predetermined meet location to the parking lot of the Flex Fitness. At the Flex Fitness parking lot, physical surveillance observed Miramontes exit a Honda Accord (BAA-1331) and enter into CHS #1's vehicle. Inside the vehicle, according to CHS #1, Miramontes produced a large bag of crystal methamphetamine and provided it to CHS #1 in exchange for the $4000.

99. CHS #1 later met with case agents and turned over a quantity of suspected crystal methamphetamine that CHS #1 stated CHS #1 obtained from Miramontes. Case agents reviewed the audio/video recordings and found them to be consistent with CHS #1's account of the transaction. The drug transaction and exchange of money for the crystal methamphetamine is clearly captured on the video, which shows Miramontes' face, and the exchange of crystal methamphetamine and cash. Case agents later field tested and weighed the crystal methamphetamine and found the total weight to be 223.6 grams. The Nark II test kit revealed a positive reaction for the presumptive presence of methamphetamine.

100. I reviewed the pen register/trap and trace data for Leflore (414-340-9162), which showed that on June 16, 2025, between 2:29PM and 4:58PM, 414-340-9162 placed or received 51 separate voice calls or text messages with 14 different contact numbers, including the call and text messages detailed above with Miramontes. However, based on the timing of Leflore's communications with Dale Fisher's **Target Cell Phones,** (including that on June 13, 2025, Leflore

placed Miramontes on hold and spoke with Dale Fisher's number), and that Leflore's vehicle was seen at Dale Fisher's residence shortly before Leflore met with Miramontes, I believe that Dale Fisher was the source of the methamphetamine that Miramontes supplied to CHS #1.

101. I believe that the historical location data requested will assist in identifying DTO stash locations and corroborating the locations of DTO members during relevant events such as the previously completed controlled buys. I believe that the call detail records requested will help identify other DTO members and potential sources of supply. I believe that the requested prospective location data will assist in proactive surveillance of DTO members and will aid in the identification of DTO members/suppliers, stash locations, and meeting locations.

102. In my training and experience, I have learned that the Service Provider is a company that provides cellular communications service to the general public. I also know that providers of cellular communications service have technical capabilities that allow them to collect and generate information about the locations of the cellular devices to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular device and, in some cases, the "sector" (i.e., faces of the towers) to which the device connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate general location of the cellular device.

**Cell-Site Data**

103. Based on my training and experience, I know that the Service Provider can collect cell-site data on a prospective basis about the **Target Cell Phones**. Based on my training and

experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as the Service Provider typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

104. Based on my training and experience, I know that Verizon also can collect per-call measurement data, which Verizon also refers to as the "real-time tool" ("RTT"). RTT data estimates the approximate distance of the cellular device from a cellular tower based upon the speed with which signals travel between the device and the tower. This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

**E-911 Phase II / GPS Location Data**

105. I know that some providers of cellular telephone service have technical capabilities that allow them to collect and generate E-911 Phase II data, also known as GPS data or latitude-longitude data. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. As discussed above, cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest

to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data. Based on my training and experience, I know that the Service Provider can collect E-911 Phase II data about the location of the **Target Cell Phones**, including by initiating a signal to determine the location of the **Target Cell Phones** on the Service Provider's network or with such other reference points as may be reasonably available.

**Pen-Trap Data**

106. Based on my training and experience, I know each cellular device has one or more unique identifiers embedded inside it. Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI"). The unique identifiers – as transmitted from a cellular device to a cellular antenna or tower – can be recorded by pen-trap devices and indicate the identity of the cellular device making the communication without revealing the communication's content.

**Subscriber Information**

107. Based on my training and experience, I know that wireless providers such as the Service Provider typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless

providers such as the Service Provider typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the **Target Cell Phones'** user or users and may assist in the identification of co-conspirators and/or victims.

108. I have a general understanding of how the cellular telephone network operates. I am aware that cell sites (towers) are strategically placed by cellular service providers, to provide a seamless operation so people can travel virtually anywhere and make or receive an uninterrupted call, send or receive text messages, or initiate a data session via their cellular phone. Usually, cell sites will be mounted high on a large pole, building, or other structure which provides line of sight with the population below. Cell sites are typically divided into sectors, which are made up of antennas connected to cellular radio transceivers. Each sector is mounted on the cell site and faces a specific direction to provide maximum cellular coverage for the people in the area. The range of the cell site and sectors depends on many factors to include environmental and geographic factors and whether it is located in a highly populated, urban environment or desolate rural area. Cell site location information (CSLI) does not provide an exact location of a cell phone; the basic call detail record data only provides the physical location of the cell site (latitude and longitude) and a direction (azimuth) the antennas are facing from the cell site.

109. I am aware when a person either initiates or receives a voice call, text message, or a data session (usage event) from their cellular device, the device broadcasts signals to the cell site that routes its communications. These signals include a cellular device's unique identifiers as well as details about the usage event. I am also aware cellular service providers collect and store these

usage event details (transaction records) associated with cellular phone numbers during the normal course of business. The usage event records, commonly referred to as call detail records, stored by their respective cell phone company, mostly contain the following information with some exceptions based on the specific carrier: Date, time, type of event, duration, phone number initiating the usage event (called, calling), even if caller identification is blocked by the calling party, text message transaction data, the international mobile equipment identifier (IMEI), the international mobile subscriber identifier (IMSI), IP packet data session logs, and cell site location and sector information at the beginning and ending of each usage event.

110. I believe such information is relevant and material to the ongoing criminal investigation as it may provide investigators with information supporting or refuting the suspect's alibi, and assist with determining other unidentified co-conspirators, and/or show the general geographic location of the target device before, during, and after the commission of the crime. This is basic information and does not provide an exact location of the person's cell phone nor does it identify the other parties.

111. I am aware that obtaining and preserving historical cell phone call detail and specialized location records could also prove to be fruitful, as such records could assist investigators not only with identifying those who may have been in contact with the victim(s) or potential co-conspirators, but may also allow investigators other opportunities, including, but not limited to, confirmation or the disproving of alibis, statements, and other observations.

112. I know that these records such as those associated with the target phone, are not kept or preserved indefinitely by the cellular service providers and are purged at different intervals. Obtaining and preserving these records at this point in the investigation will ensure the investigators assigned to the case will have them available, and if the case were to go "cold", future

investigators will have access to the records which would otherwise likely not be obtainable. Not only could the preserved records assist in proving one’s guilt, they could also assist in proving one's innocence.

113. I am aware cellular service providers maintain specialized location records consisting of engineering data. These data sets are used by the providers to troubleshoot coverage areas and report back on potential dead spots, all with the intent to oversee and optimize the cellular network. Specialized location records typically contain data for every usage event, to include technology details (e.g. voice, text, data), resource usage, and call failure information. They can also include data for incomplete calls (e.g. denied calls and set-up failures). These records not only include the basic call detail records, but also an estimation of the target phones location (Latitude and longitude) with a possible accuracy radius, and/or the distance from the cell site at the time of the usage event. Utilizing specialized location records can provide investigators with a much smaller footprint of a target phones location and could place a target phone within close proximity of a crime scene before, during and after a crime. Each carrier uses their own nomenclature to describe the technology used to obtain this data including: NELOS (Network Event Location System) – T-MOBILE, RTT (Round Trip Time/Return Trip Time/Real Time Tool) - Verizon &amp U.S. Cellular, PCMD (Per Call Measurement Data) – Sprint & U.S. Cellular, and TDOA (Time Difference of Arrival) or Timing Advance Information – T-Mobile & Metro by T-Mobile. I believe this information is relevant and material to the investigation as it provides supplemental geo-location information which, while not precise enough to identify a specific house, is accurate enough to provide block-level accuracy, in some cases. Investigators can use this information to correlate existing fact patterns and timelines to confirm or refute prior statements and/or evidence regarding the location of the target device.

114. I am seeking evidence of communication between identified subject(s) and previously unidentified individuals and entities. In my training and experience, associates communicate together via phone calls, text messages, and social media applications via data sessions and these communications most commonly occur on or through cellular devices.

115. In my training and experience individuals often use digital devices and cellular devices to post messages to others on social networking applications. In my training and experience it is possible for cellular phone users to use a variety of messaging platforms including the cellular SMS and MMS technology, as well as third-party applications like Facebook Messenger, WhatsApp, Snapchat, iMessage, and many other applications. Therefore, I seek to search all the communication evidence maintained by the service provider.

116. I am also seeking evidence of association. I know that establishing the association of co-conspirators is important in proving a concert of action between multiple persons. In my training and experience, one of the most effective methods of linking co-conspirators together is by reviewing the call detail records maintained by the cellular service providers. In my training and experience, associates communicate together via voice calls, text messages and third-party applications by means of a data usage event, therefore I am seeking the call detail record evidence to demonstrate the associations of the individuals in this case. Because this evidence is intended to be used to show associations of the user/owner of the device and co-participants, I am seeking the above items regardless of the dates the information was created.

117. I am aware cellular service providers offer their customers optional free or paid backup digital storage for some of the content stored on their device. These services are offered to secure and restore their digital information in the event their mobile device is lost or stolen. Because these digital storage services are remote and transparent to the consumer, they are often

referred to as 'cloud' storage. Customers can elect to digitally store the contents of their electronic phone book including details of their contacts, names, phone numbers, email addresses, and other data, calendar events, short message service (SMS) messages, commonly referred to as text messages, multimedia message service (MMS) messages, consisting of pictures, videos, and/or audio files with or without accompanying text, call logs of incoming, outgoing, and missed calls, digital images and videos, music and audio files, and electronic files such as documents and spreadsheets. I believe this information is relevant and material to the matter at hand as the contents of the remote digital storage may contain information presently unavailable to investigators including: associated identifying information from the user's contacts which would tend to identify possible suspect's, witnesses, associates, and/or co-conspirators, the content of messages sent between those parties, digital images and videos which may contain evidence of the crime under investigation, and documents related to same.

118. I am aware cellular service providers maintain a master cell site list of all cell sites within their network. These cell site lists will include the specific switch, cell site number, name, physical address, latitude and longitude of the cell site, all sectors associated with each cell site, azimuth, and beam-width of each related sector. When reviewing call detail and specialized location records from the carriers, the records may only reference a specific switch, cell and sector, or LAC and CID/eNodeB ID, related to each usage event; they usually will not include the location (latitude and longitude) of the actual cell site and azimuth of the sector. It becomes necessary to reference a cell site list in order to plot the exact location of the cell site and to identify the azimuth of the sector used associated with specific usage events.

119. Also, in the course of the investigation and review of the call detail and specialized location records, it may become necessary to visualize all cell sites within a geographic region of

interest, not just the cell sites used by the target phone. It is just as important to show cell sites not used by a target phone, as it is to show cell sites used. By obtaining the master cell site lists from the cellular service providers, investigators are able to plot all of the cell sites in a given region, helping investigators with disproving of alibis, statements, and other observations evidenced by the records.

120. I am seeking evidence of ownership, use, and identification of the subscriber, customer or owner of the electronic communication information contained in the records retained by the cellular service provider. I am aware, depending on whether the account is post-paid or pre-paid, a consumer must provide information to the cellular service provider. Post-paid accounts are credit based whereby a customer is provided service and then billed after the provision of services. These types of accounts require sufficient identifying information to enable the cellular service provider to make a determination regarding credit worthiness and recourse in the event the consumer defaults on their contractual agreement. The information required by most cellular service providers include the customer's personal identifying information, verified using government issued identification or other means, residential address, alternate contact phone numbers, and electronic mail (email) address(es). Additional information can include the type of service plan, additional features subscribed to, such as cloud storage and additional phones on the same account, device type and unique identifiers including IMEI and IMSI, method and source of payment information including financial institution and direct billing checking account numbers, credit or debit card numbers, and/or third-party payment processors, and customer service representative account comments and notes. I believe this information is relevant and material to the matter at hand as it serves multiple purposes including: identifying the subscriber to the target phone number, providing investigators with additional information and leads including subscriber

address, additional phone numbers, and/or email addresses, device identifiers used to correlate any seized phones with the account, previously unidentified phones subscribed to on the same account, and financial information. I know that ownership and control of a digital device can be placed at issue through a simple denial, "that is not my phone." In my training and experience some of the best ways to establish ownership and control are by reviewing account information and subscriber records from cellular service providers.

121. I am aware of the ease of being able to purchase a pre-paid cellular phone, and how it has impacted law enforcement's effort when attempting to identify criminals and locate wanted felons. It becomes very difficult, sometimes impossible, to determine the identity of a subscriber when the pre-paid providers do not require the identity of the person when obtaining/purchasing a pre-paid cellular phone. From prior training and experience, I know of many cases where pre-paid phones were used by suspects to further facilitate their criminal behavior, with the intent of concealing their true identity. Despite the lack of personally identifiable information, prepaid accounts can still provide investigators with information to identify the user. By examining the call detail and specialized location records of a pre-paid target phone, investigators can examine call and text incoming and outgoing usage events to help identify co-conspirators, associates, friends and family, who could help identify the party utilizing the pre-paid phone. Additionally, pre-paid services typically require some mechanism of payment including pre-paid cards, cash payments at retail establishments, or via an online portal. The financial information may assist investigators with identifying the locations where the pre-paid cards were purchased, the location of the retail establishments used for cash payments, and/or associated online account information and Internet Protocol (IP) addresses.

## AUTHORIZATION REQUEST

122. Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

123. I further request that the Court direct the Service Provider to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.

124. I also request that the Court direct the Service Provider to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of the **Target Cell Phones** on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

125. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until March 27, 2026, constitution with the omnibus order signed buy Magistrate Judge Duffin on March 27, 2025, after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the **Target Cell Phones** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified

in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

126. Because the warrant will be served on the Service Provider, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the **Target Cell Phones** outside of daytime hours.

**ATTACHMENT A**
**Property to Be Searched**
**Matter No. 2025R00094**

1. Records and information associated with the cellular telephone assigned call numbers **(414) 252-9913** and **(414) 888-2248** (the "**Target Cell Phones**"), with a listed subscriber as Dale Fisher, with Candance Fisher as an authorized person on the account, that is in the custody or control of U.S. Cellular (referred to herein and in Attachment B as the "Service Provider"), a wireless communications service provider that is headquartered at 8410 W. Bryn Mawr Avenue, Suite 800, Chicago, IL 60631.

2. The **Target Cell Phones**.

**ATTACHMENT B**
**Particular Things to be Seized**
**Matter No. 2025R00094**

## I. Information to be Disclosed by the Service Provider

To the extent that the information described in Attachment A is within the possession, custody, or control of the Service Provider, including any information that has been deleted but is still available to the Service Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Service Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

a. The following subscriber and historical information about the customers or subscribers associated with **(414) 252-9913** for the time period October 1, 2024, to the present and **(414) 888-2248** for the time period May 6, 2025, to the present:

   i. Names (including subscriber names, user names, and screen names);

   ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

   iii. Local and long distance telephone connection records;

   iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

   v. Length of service (including start date) and types of service utilized;

   vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

   vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

   viii. Means and source of payment for such service (including any credit card or bank account number) and billing records; and

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the **Target Cell Phones**, including:

1. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

2. information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received) as well as data connection location information and transactions (registration of network events), related to all specialized carrier records that may be referred to as LOCDBOR (Location Database), Historical Mobile Locate (HML), NELOS (Network Event Location System), RTT (Round Trip Time/Return Trip Time/Real Time Tool), PCMD (Per Call Measurement Data), TDOA (Time Difference of Arrival) or Timing Advance Information, Mediation Records, E9-1-1, and/or Historical GPS/Mobile Locate Information which shows GPS location (longitude and latitude) and Cell-Site and sector of the device in relationship to the network when connected to the network for the above referenced number.

b. Information associated with each communication to and from the **Target Cell Phones** for a period of 30 days from the date of this warrant, including:

i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

ii. Source and destination telephone numbers;

iii. Date, time, and duration of communication; and

iv. All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the **Target Cell Phones** will connect at the beginning and end of each communication as well as data connection location information and transactions (registration of network events), related to all specialized carrier records that may be referred to as LOCDBOR (Location Database), Historical Mobile Locate (HML), NELOS (Network Event Location System), RTT (Round Trip Time/Return Trip Time/Real Time Tool), PCMD (Per Call Measurement Data), TDOA (Time Difference of Arrival) or Timing Advance Information, Mediation Records, E9-1-1, and/or Historical

GPS/Mobile Locate Information which shows GPS location (longitude and latitude) and Cell-Site and sector of the device in relationship to the network when connected to the network for the above referenced number.

The Honorable William E. Duffin has also issued an order pursuant to 18 U.S.C. § 3123, dated June 2, 2025, for such information associated with **414-252-9913** and June 17, 2025, for such information associated with **414-888-2248**.

c. Information about the location of the **Target Cell Phones** for a period of 30 days, during all times of day and night. "Information about the location of the Subject Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Service Provider, the Service Provider is required to disclose the Location Information to the government. In addition, the Service Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of the **Target Cell Phones** on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

ii. This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II. Information to be Seized by the Government

All information described above in Section I that constitutes evidence, fruits, contraband, and instrumentalities of violations Title 21, United States Code, §§ 841(a), 843(b), and 846 involving Quentin Apkarian, Joey Miramontes, Joshua Ramos, Christopher Badgett, Kiara Ramos, Trayveon Roy, Isaac Sawyer, Jaime Rosado, Andrew Gbur, Elion LeFlore, Dale Fisher, and others known and unknown, during the period of October 1, 2024 to the present.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Service Provider in order to locate the things particularly described in this Warrant.